IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Argentum Medical, LLC,<br><br>    Plaintiff,<br><br>v.<br><br>Noble Biomaterials,<br><br>Derma Sciences, Inc.,<br><br>    Defendants. | No. 07 cv 6769<br><br>Hon. George W. Lindberg<br>Magistrate Judge Cole |

### Declaration Of Robert C. Cole

I, Robert C. Cole, declare as follows:

1. I am over eighteen years of age, and I am Executive Vice President for Sales for Defendant Derma Sciences, Inc. ("Derma").

2. I have held my current position since 2006, and I joined Derma as a Vice President – Sales and Marketing in 2003. As Executive Vice President for Sales, my responsibilities include being familiar with Derma's products and managing Derma's sales. I also am familiar with Derma's operations, physical locations, and its place of incorporation. Therefore, I have personal knowledge of the following facts.

3. Derma is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania and headquartered in Princeton, New Jersey.

4. Derma is in the business of manufacturing, marketing, and selling wound and skin care products.

5. I have obtained and reviewed a copy of the Complaint in this case, including U.S. Patent No. 7,230,153 (the "'153 patent") which is attached to the Complaint. Based on my reading and understanding of the '153 patent, I believe that Derma sells only one product that

might be similar to the subject matter disclosed in the '153 patent. That product is Derma's Silver Seal™ wound dressing.

6. Derma has not had and does not have any role in the design or manufacture of Silver Seal dressings. Instead, Derma buys all of its Silver Seal dressings pursuant to a Distributorship Agreement with a company called Noble Fiber Technologies, LLC ("Noble Fiber"), now known as Noble Biomaterials. A true and correct copy of the Distributorship Agreement is attached to this Declaration as Exhibit A.

7. In the Distributorship Agreement, Noble Fiber warranted to Derma that it would comply with all applicable laws and indemnify Derma in connection with any valid patent infringement claim. (Distributorship Agreement at ¶ 11(b).)

8. The Distributorship Agreement contains a forum selection clause directing disputes between Derma and Noble Fiber to the Middle District of Pennsylvania or Pennsylvania state courts. (Distributorship Agreement at ¶ 13(i).)

9. Derma began selling Silver Seal dressings in April 2005. To date, Derma's revenues from the sale of Silver Seal dressings total $901,482.74, of which only $5,002.00 was derived from sales to a customer in Illinois. Moreover, Derma's last sale to any customer in Illinois was on June 7, 2007.

10. Approximately 75% of the Silver Seal dressings are sold to the U.S. Department of Defense and shipped to a depot in the vicinity of Philadelphia, Pennsylvania. The balance of the Silver Seal products are sold to a variety of distributors and end-users throughout the United States.

11. Noble Biomaterials and affiliated entities are all based in Scranton, Pennsylvania. Therefore, to the best of my knowledge, all witnesses with knowledge of the design, structure, and operation of Silver Seal dressings are located in and around Scranton, Pennsylvania.

I declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Dated: February 25, 2008

_____
Robert C. Cole

# Exhibit A

# DISTRIBUTORSHIP AGREEMENT

THIS AGREEMENT is entered into as of April 15, 2005, between NOBLE FIBER TECHNOLOGIES, LLC, a Pennsylvania limited liability company (the "Company") and DERMA SCIENCES, INC., a Pennsylvania corporation ("Distributor").

## BACKGROUND

The Company is the distributor of certain medical products more particularly described on Exhibit "A" hereto (together with any additional products which may from time to time be added to such schedule by agreement of the parties hereto, the "Noble Medical Products"). The Noble Medical Products are manufactured by or for the Company using silver coated fibers, fabrics and foams, that are proprietary in nature to the Company or to the manufacturer of the Noble Medical Products (collectively, the "Fiber Products"). The Noble Medical Products will be marketed under the certain trademarks (collectively, the "Noble trademarks") owned by Noble, including, without limitation: (a) SilverSeal®, (b) X-Static®, (c) The Silver Fiber®, (d) X-Shirt™, (e) Faster Better Smarter Silver™, and (f) Noble Biomaterials™.

The Company and the Distributor wish to enter into this Agreement pursuant to which the Distributor shall market and sell the Noble Medical Products in the United States and Canada (the "Territory") on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. **Designation, Rights and Obligations of Distributor.**

    (a) The Company hereby grants to the Distributor, subject to the Distributor's performance of each of the Distributor's obligations under this Agreement: (i) subject to the limitations set forth herein, a limited, exclusive right (the "Exclusive Right") to market and sell the Noble Medical Products to the Defense Supply Center Philadelphia ("DSCP"); and (ii) a limited non-exclusive right to market and sell the Noble Medical Products throughout the Territory. The rights granted under this Agreement are personal to the Distributor and are not assignable without the Company's prior written consent, which consent may be withheld by the Company for any reason.

    (b) The Distributor hereby acknowledges and agrees that, except with respect to the Exclusive Right, this Agreement will not affect or limit, in any way, the Company's right to: (i) enter into additional distribution agreements with one or more other distributors for sale of the Noble Medical Products within or outside of the Territory; (ii) sell the Noble Medical Products directly to persons or entities in within or outside of the Territory; or (iii) to restrict, discontinue or otherwise limit the manufacture, sale or other distribution of the Noble Medical Products in the Company's sole and exclusive discretion.

    (c) The Distributor agrees that it will use its best efforts to aggressively market

04/15/2005  09:56 AM                        From: 8773782842;26638        To:    NobleFiberTech   Page 3
Apr. 15. 2005 12:52PM                                                     No. 6933   P. 3/16

the Noble Medical Products in order to ensure the highest volume of sales of the Noble Medical Products in the Territory. The Distributor shall take such actions as are reasonable necessary to perform its duties and obligations hereunder.

(d) Distributor hereby acknowledges and agrees that it will not advertise the Noble Medical Products, the Fiber Products or the Trademarks, or otherwise attempt to sell or otherwise distribute the Noble Medical Products outside of the Territory without the prior written consent of the Company, which consent may be withheld by the Company for any reason, in the Company's sole discretion.

(e) During the term of this Agreement, the Distributor will not directly or indirectly be involved or interested in buying, selling, distributing or otherwise dealing in medical products containing silver coated fibers, fabrics or yarns within the Territory which are similar to, or would compete directly with, the Noble Medical Products. Notwithstanding the foregoing, the Distributor shall be entitled to sell any existing inventories of competing products hereunder the longer of (i) sixty (60) days; or (ii) until the applicable Noble Medical Product is commercially available to the Distributor. If the Distributor identifies any medical product containing silver coated fibers, fabrics, yarns or foams, and the Company is not then manufacturing a similar product, the Distributor shall, prior to entering into any relationship for the sale or distribution of such products: (i) notify the Company of the Distributor's interest in selling or distributing such product, and (ii) provide the Company with the first opportunity to provide such product to the Distributor for sale or distribution by the Distributor.

(f) The Distributor will keep Company fully informed of any changes in local or general market or regulatory conditions of which the Distributor becomes aware which may affect Company's interests or the marketing or sales of the Noble Medical Products within the Territory.

(g) The Distributor shall immediately notify the Company, in writing, upon receipt of any complaints by any purchasers of the Noble Medical Products, detailing the name and contact information of such customer, the nature of the complaint, and any other information relating to such complaint as would be reasonably necessary in order for the Company to understand such complaint and to correct any potential problems relating to the Noble Medical Products.

(h) Distributor will keep accurate records of all contacts made with any person within DSCP or otherwise related to the selling of the Noble Medical Products to DSCP and to Noble Identified Customers (as defined herein). Distributor will furnish to the Company, within thirty (30) days after the end of each calendar quarter, an updated report setting forth: (i) the total sales of Noble Medical Products to DSCP and to Noble Identified Customers by the Distributor during such calendar quarter; (ii) the price for which the Noble Medial Products were sold to DSCP and such Noble Identified Customers, and (iii) the status of any negotiations with any Noble Identified Customers. For the purposes hereof, a "Noble Identified Customer" shall be a customer or potential customer for the Noble Medical Products, first identified by the Company and referred to the Distributor for the purchase of

Mar 15 2005 14:11    Sanquoit Industries, Inc.    570-558-2547    p.18

04/15/2005   09:56 AM   From: 8779782842:26638   To:   NobleFiberTech   Page   4

Apr. 15. 2005 12:52PM                                               No. 6933   P. 4/16

Noble Medical Products.

(i) Both parties hereto acknowledge and agree that the entering into this Agreement does not make the Distributor the agent, legal representative, or partner of Company for any purpose whatsoever, and Distributor acknowledges and agrees that the Distributor shall not have any right to bind the Company to any contract or agreement, whether or not related to the Noble Medical Products.

(j) The Distributor shall not alter any original packages or repackage any Noble Medical Products in any way prior to resale of the Noble Medical Products hereunder.

(k) Subject to the provisions hereof, the Distributor shall have the right to identify and select its own customers for the Noble Medical Products within the Territory, and to establish its own pricing for sale to customers. Title for the Noble Medical Products shall pass to Distributor upon payment in full of the purchase price thereof to the Company, and risk of loss for such Noble Medical Products shall pass to Distributor upon delivery of such Noble Medical Products to the Distributor.

(l) The Distributor shall at all times perform its obligations hereunder in accordance with all applicable local, state and federal laws, will qualify to do business in each state in which the nature of its obligations hereunder require it to so qualify, and will remain in good standing in each such state during the term of this Agreement.

(m) The Distributor shall set up and implement control procedures with respect to the Noble Medical Products in accordance with all applicable rules, laws and regulations.

(n) In addition to the foregoing, the Distributor understands and agrees that:

(i) the Distributor is acting as an independent contractor under this Agreement, and will be solely responsible for the payment of all taxes, employment-related claims and all other claims in connection with its business, including its performance under this Agreement,

(ii) the Distributor shall have no right or authority to assume or to create any obligation or responsibility, express or implied, on behalf of or in the name of the Company or any of its affiliates, or to bind Company or any of its affiliates in any manner whatsoever;

(iii) the Distributor shall restrict its representations with respect to its association with the Company to the responsibilities described in the Agreement.

(iv) the Distributor shall not use the name of the Company or any affiliate of the Company on its letterhead or in any other manner not previously approved in writing by the Company.

(v) the Distributor shall not make any representations, warranties, or

Mar 15 2005 14:11   Sanquoit Industries, Inc.   570-558-2547   p.19

statements concerning the present or future business, operations, or products of Company or the Noble Medical Products, or utilize any sales literature not previously approved by the Company describing the Noble Medical Products or their use or application, without the prior written consent of the Company, which consent may be withheld by the Company, in its sole and absolute discretion.

(vi) The Distributor shall not, at any time or for any reason, take any legal action on behalf of the Company or its affiliates, or hold itself out as an official representative of the Company in connection with any legal action brought by or against the Company or its affiliates. If the Distributor violates any provisions of this section, the Distributor shall be solely responsible for all costs incurred by the Distributor or the Company (including its affiliates) resulting from the Distributor's actions. In addition, upon any violation of this provision by the Distributor, the Company shall have the right, in its discretion, to terminate this Agreement, effective immediately upon notice to the Distributor.

2. **Sales through DSCP**

(a) The Distributor shall be the exclusive distributor of the Noble Medical Products through the DSCP for so long as the following conditions are satisfied:

(i) The Distributor shall have a current, valid Distribution and Pricing Agreement (the "DAPA Agreement") with the DSCP, setting out the DSCP's then current pricing for the Noble Medical Products.

(ii) The Distributor shall meet the Minimum DSCP Sales Amount (as defined herein) of Noble Medical Products through DSCP during each twelve month period, commencing with the twelve month period beginning October 1, 2005. The obligations of the Distributor hereunder will be measured quarterly, on a rolling four quarter basis, beginning with the calendar quarter ending December 31, 2005. If, after any two consecutive calendar quarters, the Company reasonably determines that the Distributor will not be able to meet the Minimum DSCP Sales Amount for the applicable twelve month period, the Company may, in its discretion, terminate the exclusive nature of the Exclusive Right. Upon any such termination of the Exclusive Right, the Distributor shall maintain the right to sell Noble Medical Products through DSCP, on a non-exclusive basis, for the remainder of the term of this Agreement. For the purposes hereof, the Minimum DSCP Sales Amount shall be the minimum aggregate amount of Noble Medical Products required to be sold by the Distributor in any twelve month period hereunder in order to retain the Exclusive Right. The parties shall use good faith efforts to agree upon the Minimum DSCP Sales Amount. If the parties hereto cannot agree upon the Minimum DSCP Sales Amount within 120 days from the date of this Agreement, the Company shall have the right, in its discretion, to terminate the exclusive nature of the Exclusive Right. Upon any such termination of the Exclusive Right, the Distributor shall have the right to sell the Noble Medical Products to DSCP, on a non-exclusive basis, for the remainder of the term of this Agreement.

(iii) The Distributor shall not be in violation of any provisions of its

04/15/2005 09:56 AM Case 1:07-cv-06769 Document 18-2 Filed 02/26/2008 Page 9 of 19
From: 8779782842:26638 To: NobleFiberTech Page 6

Apr. 15. 2005 12:53PM No. 6933 P. 6/16

DAPA Agreement, and its sales to DSCP under such DAPA Agreement shall comply with all applicable rules, laws and regulations relating to the same.

3. **Obligations of the Company.**

(a) All Noble Medical Products shall be manufactured in accordance with all applicable federal, state and local laws regulating the manufacture and sale of the Noble Medical Products.

(b) The Company will provide sufficient samples of Noble Medical Products to the Distributor in accordance with the Company's sample policy. Reasonable quantities of such samples will be provided to the Distributor at no cost. All such samples may, in the Company's discretion, be marked "sample" and "Not for Resale". Not later than fifteen (15) days after the end of each calendar month, the Distributor shall provide to the Company a report setting out the total number of samples in the Distributor's possession, and the location of such samples.

(c) The Company and its sales personnel shall assist the Distributor in marketing the Noble Medical Products. The Company shall provide sales training for the Distributor's sales personnel and, upon reasonable request by Distributor, shall accompany the Distributor's sales personnel on customer visits to new potential customers for the Noble Medical Products. The Distributor agrees that the Company shall have the right, at the Company's expense, to accompany the Distributor's sales personnel on any customer visits to DSCP and to Noble Identified Customers in which the Company elects to participate, and shall be entitled to participate in the sales presentation to any Noble Identified Customers and to DSCP and other governmental departments and agencies that purchase medical products and devices through DSCP.

(d) The Company shall provide advertising and promotional literature to Distributor, at the Company's cost therefore, and the Company shall ensure that all such advertising and promotional literature in prepared and meets the requirements of all applicable laws and regulations.

4. **Pricing for Noble Medical Products, Orders and Returns**

(a) The prices for the Noble Medical Products to be sold to the Distributor for the initial term of this Agreement are set forth on Exhibit "A" hereto. In the event that the cost of raw materials or production costs (collectively, the "Increased Production Costs") used in the manufacture of the Noble Medical Products shall increase during any term of this Agreement, the parties hereto shall use good faith efforts to adjust the price of the Noble Medical Products so that the parties hereto share equally in such Increased Production Costs.

(b) The Distributor shall have the right to set its pricing for resale of the Noble Medical Products to its customers, subject to the restrictions on pricing to DSCP set forth herein.

04/15/2005 09:56 AM  Case 1:07-cv-06769   Document 18-2   Filed 02/26/2008   Page 10 of 19
From: 8779782842:28638   To:   NobleFiberTech   Page 7

Apr. 15. 2005 12:54PM                                                    No. 6933   P. 7/16

(d) The Distributor shall provide, not later than ten days after the end of each calendar quarter, a good faith written rolling forecast of the Distributor's requirements for Noble Medical Products for the twelve months following such calendar quarter.

(e) All orders for Noble Medical Products shall be submitted not later than thirty (30) days prior to the requested delivery date therefore. All orders shall be submitted by written purchase order, on the Company's standard form of purchase order. If the amount of Noble Medical Products set forth on purchase orders exceeds the forecasted amount of Noble Medical Products for any calendar month, the Company shall use its reasonable efforts to provide the Noble Medical Products requested in such purchase order. In the event that the Company cannot meet the requested delivery date set forth in any purchase order, the Company shall notify the Distributor within (5) business days after receipt of the applicable purchase order.

(f) All orders for Noble Medical Products shall be F.O.B., Scranton, Pennsylvania. All payment for Noble Medical products shall be due not later than twenty (20) days after the invoice date therefore. The Company shall not ship any Noble Medical Products if the Distributor is then in default for any amounts owed for any prior orders of Noble Medical Products. Upon any default in the payment of amounts owed by the Distributor for Noble Medical Products, the Company may, in its discretion, require that all future orders for Noble Medical Products to the Distributor be prepaid by the Distributor prior to shipping.

(g) If any Noble Medical Products are returned to the Distributor as a result of any defect in the Noble Medical Products, the Distributor shall immediately provide notice to the Company, setting out the reasons for the return of the Noble Medical Products. The Company shall have the right to examine all returned Noble Medical Products and the Distributor shall be given a credit for all defective Noble Medical Products in an amount equal to the purchase price, including shipping and handling charges, which the Distributor actually paid to the Company for such defective Noble Medical Products. If the Distributor accepts any Noble Medical Products for return which are determined not to be defective, the Distributor shall not be entitled to any credit for such returned Noble Medical Products.

5. **Distributor's Compensation.** The following provisions shall govern the Distributor's right to compensation under this Agreement:

(a) The Distributor's sole source of income under this Agreement shall be from the resale of Noble Medical Products under this Agreement.

(b) The Distributor understands and agrees that any costs and expenses incurred by the Distributor in performing its obligations under this Agreement, including without limitation, any costs incurred in the identification of any potential customers for the Noble Medical Products, any costs incurred in the negotiation of the Distributor's sale price of the Noble Medical Products to such customers, any advertising costs and any other expenses

6

04/15/2005   09:56 AM                        From: 8779782842:26638        To:    NobleFiberTech    Page    8
Apr. 15. 2005 12:54PM                                                            No. 6933   P. 8/16

incurred by the Distributor, including, without limitation, any costs associated with any trade shows, symposiums, travel expenses or other expenses shall be the sole responsibility of the Distributor, unless the Company has agreed, in its discretion, in writing, prior to the incurrence thereof, to share in such expenses.

6. **Representation and Warranties of Distributor.** Distributor represents, warrants, and covenants as follows:

(a) During the term of this Agreement, the Distributor will comply with all applicable laws, including the applicable laws of the United States of America, the laws of the jurisdiction where the Distributor maintains its principal place of business, and the laws of any other jurisdiction which may be applicable to the performance of the Distributor's duties and obligations under this Agreement. Distributor will maintain such records as may be necessary to reflect such compliance and will make such records available for inspection and copying by Company and its agents during normal business hours.

(b) Distributor's execution, delivery, and performance of this Agreement does not conflict with or violate any law or governmental regulation or court order or decree applicable to it, or any contract or instrument binding upon it. No notice to, or filing with, any government authority or regulatory body or other person is required for the execution, delivery and performance by Distributor of this Agreement. The Distributor is not bound by any business arrangement, either written or oral, with any party which would preclude the Distributor from entering into this Agreement or would prohibit the Distributor from complying with each and every provision hereof.

(c) The Distributor is not insolvent and will not be rendered insolvent by the performance of its obligations under this Agreement.

7. **Representation and Warranties of Company.** The Company represents, warrants, and covenants as follows:

(a) During the term of this Agreement, the Company will comply with all applicable laws, including the applicable laws of the United States of America, the laws of the jurisdiction where the Company maintains its principal place of business, and the laws of any other jurisdiction which may be applicable to the performance of the Company's duties and obligations under this Agreement.

(b) The Company's execution, delivery, and performance of this Agreement does not conflict with or violate any law or governmental regulation or court order or decree applicable to it, or any contract or instrument binding upon it, no notice to or filing with, any government authority or regulatory body or other person is required for the execution, delivery and performance by Company of this Agreement.

(c) The Company is not insolvent and will not be rendered insolvent by the performance of its obligations under this Agreement.

Mar 15 2005 14:14    Sandguit Industries, Inc.    570-558-2547    p.23

8.  **Confidentiality:**

   (a)   All materials, documents, information and equipment which either party supplies or discloses to the other party, whether in writing or orally, which is identified as confidential at the time of disclosure, shall be considered proprietary trade secrets of the disclosing party. The receiving party agrees not to disclose any such matters to any third party without the disclosing party's advance written consent and not to use it in any way detrimental to the disclosing party's interests. The receiving party further agrees to ensure that the dissemination of such information among its employees, agents, representatives and contractors is restricted to those persons who are obliged to maintain the confidentiality of the information and have a demonstrated need to have access to it in order to market and promote the Noble Medical Products and the Trademarks. However, confidential information subject to the restrictions of this Section 6 shall not include: (i) information currently in the public domain; (ii) information which becomes public through no fault of the receiving party; (iii) information previously known to the receiving party prior to its disclosure to the receiving party by the disclosing party, as shown by the receiving party's contemporaneous written records; or (iv) information disclosed to the receiving party by a third party not in breach of any agreement.

   (b)   The confidentiality provisions set forth in this Section 8 shall extend and apply to any persons engaged by either party as agents, including, without limitation, the parties' respective employees, contractors, attorneys and accountants.

   (c)   The parties agree that irreparable damage would result to the other party in the event that any of the confidentiality provisions contained in this Section 8 are not performed in accordance with their specific terms or are otherwise breached. It is accordingly agreed that, in addition to any other rights which the non-violating party may have at law or equity, the non-violating party will be entitled to an injunction or injunctions, without being required to post a bond, to prevent breaches hereof and to enforce specifically the terms and provisions of this letter pertaining to confidentiality.

   (d)   The obligations of each party under this Section 8 will remain in full force and effect for three (3) years following any termination of this Agreement.

9.   **Term of Agreement:** The term of this Agreement (the "Term") shall begin on the date hereof and expire on October 15, 2006, unless sooner terminated as set forth herein. The Term shall automatically renew for successive one-year periods unless, not less than ninety (90) days prior to the expiration of the then current term hereof, either party hereto notifies the other party hereto of its intent not to renew this Agreement.

10.  **Trademark Protections.**

   (a)   All advertising and promotional materials created or otherwise used by the Distributor in the marketing of the Noble Medical Products shall show the SilverSeal Trademark, Faster Better Smarter Silver trademark, and such other Trademarks of the Company as the Company shall from time to time require. All such advertising and

04/15/2005  09:58 AM                    From: 8779782842:26638      To:      NobleFiberTech  Page 10
Apr. 15. 2005 12:55PM                                                        No. 6933    P. 10/16

promotional materials shall be submitted to the Company for the Company's approval prior to the Distributor's use thereof.

(b) All trademarks and trademark rights created by the use of the Trademark by the Distributor hereunder shall inure to the benefit of the Company, which shall own all such trademarks and trademark rights created by such uses. The Distributor hereby assigns and transfers to the Company all trademarks and trademark rights, if any, created by the Distributor's use of the Trademarks.

(c) The Distributor shall keep appropriate records relating to the dates when the each Trademark is first used in connection with the performance of its obligations hereunder. If requested to do so by the Company, the Distributor agrees to supply the Company with samples of the trademark usage in question and other information which will enable the Company to complete and obtain trademark applications or registrations or to evaluate or oppose any trademark applications, registrations, or uses of other parties.

(d) The Distributor agrees to affix the applicable symbol ® or ™ to each use of the Trademarks in any advertising or promotional materials used in the marketing of the Noble Medical Products.

(e) The Distributor recognizes that there is great value to Company in the Trademarks and in the goodwill associated with the Trademarks and that nothing contained in this Agreement shall be construed as giving the Distributor any interest or property rights in the Trademarks, except the right to use it as specifically set forth in this Agreement. The Distributor agrees that it will not, during the period of this Agreement or at any time thereafter, directly or indirectly, assert any interest or property rights in the Trademarks. The Distributor acknowledges the validity of the Company's title to the Trademark and agrees that it will not contest said title.

(f) If, at any time, the Distributor learns that any party is or may be making unauthorized use of the Trademarks, the Distributor shall give the Company prompt written notice thereof, setting forth in full detail, the actions by such party. The Distributor agrees to cooperate with the Company at no out-of-pocket expense to the Distributor in connection with any action taken by the Company to terminate any infringements.

11. **Indemnification**.

(a) The Distributor agrees to indemnify and hold the Company, its affiliates, agents, officers and directors (each, a "Distributor Indemnified Party") harmless from any and all Damages arising from claims, liabilities, judgments, penalties, losses, costs, damages and expenses, including reasonable attorneys' fees (collectively, "Damages"), made by third parties against any Distributor Indemnified Party arising by reason of or in connection with any act in violation of this Agreement, any false or misleading representation or warranty of the Distributor hereunder, or by virtue of the use of the Trademarks, or any of them, by the Distributor or its subsidiaries, or the employees or agents of any of the foregoing in any manner not authorized herein. Notwithstanding the foregoing, in no circumstances shall the

Mar 15 2005 14:15    Sanquoit Industries, Inc.    570-558-2547    p. 25

04/15/2005    09:56 AM                    From: 8779782842;26638        To:       NobleFiberTech    Page 11
Apr. 15. 2005 12:56PM                                                                  No. 6933    P. 11/16

Distributor be liable to the Company for incidental or consequential damages (including, without limitation, loss of business opportunity, loss of sales, loss of anticipated profits, etc.), arising from strict liability, tort, contract or any other legal theory, related to the Distributor's performance hereunder, and the liability of the Distributor hereunder shall be limited to actual damages paid by the Company, provided, however, that the foregoing limitations shall not apply if the Damages suffered by the Company are a result of any representations or warranty made by the Distributor in paragraph 6(b) of this Agreement shall be proven to have been false or intentionally misleading when made.

(b) The Company agrees to indemnify and hold the Distributor, its affiliates, agents, officers and directors (each, a "Company Indemnified Party") harmless from any and all Damages, arising out of claims by third parties against any Company Indemnified Party arising by reason of or in connection with any valid claim that the Noble Medical Products or the Trademarks infringe upon the intellectual property rights of any third person or entity not a party to this Agreement, or against any injury to any person proven to be caused by the proper use of Noble Medical Products. Notwithstanding the foregoing, in no circumstances shall the Company be liable to the Distributor for incidental or consequential damages (including, without limitation, loss of business opportunity, loss of sales, loss of anticipated profits, etc.), arising from strict liability, tort, contract or any other legal theory, related to the Noble Medical Products, and the liability of the Company hereunder shall be limited to actual damages paid by the Distributor.

12. **Breach and Termination**.

(a) Except as otherwise set forth herein, if the Distributor breaches any of the material terms and provisions of this Agreement and fails to cure such breach within: (a) twenty (20) days for monetary defaults, and (b) sixty (60) days for non-monetary defaults, after receiving written notice thereof from the Company specifying the particulars of the breach, the Company shall have the right to terminate this Agreement by giving written notice to the Distributor by registered or certified mail (such termination to be effective ten (10) days after giving of such notice).

(b) If the Distributor becomes insolvent, or if a petition for bankruptcy or reorganization is filed by or against such party, or if any insolvency proceedings are instituted by or against it under the law of any jurisdiction, or if it makes an assignment for the benefit of its creditors, or is placed in the hands of a receiver, or if it liquidates its business in any manner, then the Company shall have the right to terminate this Agreement by written notice by registered or certified mail to the Distributor, its receivers, trustees, assignees or other representatives. If the Company terminates this Agreement under the provisions of this subparagraph 12(B), the Distributor, its receivers, trustees, assignees, or other representative shall have no right to use the Trademarks in any advertising materials or otherwise deal with the Trademark except with and under the special written consent and instructions of the Company, which consent may be withheld for any reason.

(c) If the Company becomes insolvent, or if a petition for bankruptcy or reorganization is filed by or against such party, or if any insolvency proceedings are

10

Mar 15 2005 14:15    Sandquit Industries, Inc.    570-558-2547    p. 26

04/15/2005   09:56 AM                    From: 8779782842:26638        To:     NobleFiberTech   Page 12

Apr. 15. 2005 12:56PM                                                            No. 6933   P. 12/16

instituted by or against it under the law of any jurisdiction, or if it makes an assignment for the benefit of its creditors, or is placed in the hands of a receiver, or if it liquidates its business in any manner, then the Distributor shall have the right to terminate this Agreement by written notice by registered or certified mail to the Company, its receivers, trustees, assignees or other representatives.

(d) Upon the expiration hereof, or the effective date of any sooner termination of this Agreement in accordance with the provisions hereof, the Distributor hereby agrees to immediately and permanently discontinue any advertising materials or other promotional materials bearing any of the Trademarks or otherwise related to the sale, distribution or other use of the Noble Medical Products. The Distributor shall promptly return to the Company any and all printed materials relating to the Noble Medical Products or containing any of the Trademarks.

13. **Miscellaneous Provisions.**

(a) **Restriction on Assignments.** Without the prior written consent of the Company, the Distributor shall not directly or indirectly assign, transfer, sublicense, or encumber any of its rights under this Agreement. This Agreement shall be binding upon and inure to the benefit of the successors and assigns of the Company and the Distributor.

(b) **Parties to Joint Venture.** Nothing contained in this Agreement shall be construed so as to make the parties partners or to permit the Distributor to bind the Company to any agreement or purport to act on behalf of the Company in any respect.

(c) **Modifications of Agreement.** No waiver or modification of any of the terms of this Agreement shall be valid unless in writing, signed by both parties. Failure by either party to enforce any rights under this Agreement shall not be construed as a waiver of such rights, and a waiver by either party of a default in one or more instances shall not be construed as a continuing waiver or as a waiver in other instances.

(d) **Invalidity of Separable Provisions.** If any term or provision of this Agreement is for any reason held to be invalid, such invalidity shall not affect any other term or provision, and the Agreement shall be interpreted as if such term or provision had never been contained in this Agreement.

(e) **Addresses for Notices.** All notices and other communications provided for hereunder shall be in writing and shall be duly given when personally delivered, telecopied (with electronic confirmation), deposited in the United States mail, certified or return receipt requested, postage prepaid, or delivered to Federal Express or any nationally recognized overnight courier service, and addressed or sent to the following address or telecopy number for the receiving party:

Mar 15 2005 14:16    Sandquit Industries, Inc.   570-558-2547    p.27

04/15/2005   09:56 AM                From: 8779782842:26638         To:    NobleFiberTech   Page 13
Apr. 15. 2005 12:57PM                                                              No. 6933   P. 13/16

|  |  |
|---|---|
| If to Company | Noble Fiber Technologies, LLC.<br>421 S. State Street<br>Clarks Summit, PA 18411<br>Telecopy: (570) 348-2760 |
| with copy to: | James L. Purcell, Jr., Esquire<br>Stoneburner Berry & Simmons, P.A.<br>841 Prudential Drive, Suite 1400<br>Jacksonville, Florida 32207<br>Telecopy: (904) 396-9001 |
| If to Distributor: | Derma Sciences, Inc.<br>214 Carnegie Center, Suite 100<br>Princeton, NJ 08540<br>Telecopy: (609) 514-0502 |
| with copy to: | Raymond C. Hedger, Jr., Esquire<br>Hedger & Hedger<br>2 Fox Chase Drive<br>P.O. Box 915<br>Hershey, Pennsylvania 17033<br>Telecopy: 717-534-9813 |

Any party may change its address or telecopy number for notices under this Agreement at any time by giving the other party notice of such change.

(f) **Force Majeure.** Neither party hereto shall be responsible for any failures or delays which are due to causes beyond its control, including, without limitation, acts of God, acts of the government, war, fires, floods, strikes or failure of third parties (which parties are not an affiliate or subsidiary of such party) to comply with their obligations to such party.

(g) **Headings.** The paragraph and section headings of this Agreement are inserted only for convenience and shall not be construed as a part of this Agreement.

(h) **Entire Understanding.** This Agreement sets forth the entire understanding of the parties with respect to its subject matter. Any and all representations or agreements made by any agent or representative or either party to the contrary shall be of no effect.

(i) **Governing Law.** This Agreement shall be construed and governed in accordance with the laws of the State of Pennsylvania, regardless of the place or places of its physical execution and performance. The Distributor hereby submits to the jurisdiction of the State courts of Pennsylvania and the federal courts located in Pennsylvania, and agrees

Mar 15 2005 14:17   Sanquoit Industries, Inc.   570-558-2547   p.28

that all actions brought under this Agreement shall be brought in the State courts of Pennsylvania and the Federal Courts located in Scranton Pennsylvania.

IN WITNESS HEREOF, the Company and the Distributor have duly executed this Agreement as of the date first above written.

NOBLE FIBER TECHNOLGIES, LLC

By: _____
William McNally
Manager

DERMA SCIENCES, INC.

By: _____
Edward J. Quilty
President and Chief Executive Officer

13

|  |  | Exhibit "A" |  |  |  |
|  |  | Noble Medical Products |  |  |  |
| Product Code | Size | Dressings Per Box | Dressings Per Case | Unit Price To Derma | Case Price |
| **Wound Contact Dressings** | | | | | |
| WCD-22 | 2" x 2" | 10 | 100 | | $385.00 |
| WCD-44 | 4" x 4" | 10 | 100 | | $687.05 |
| WCD-412 | 4" x 12" | 10 | 100 | | $1,931.58 |
| WCD-1012 | 10" x 12" | 5 | 50 | | $1,912.50 |
| WCD-466 | 4" x 66" | 1 | 10 | | $805.51 |
| | | | | | |
| **Island Dressings** | | | | | |
| ID-23 | 2" x 3" | 10 | 100 | | $485.00 |
| ID-44 | 4" x 4" | 5 | 50 | | $296.14 |
| ID-66 | 6" x 6" | 5 | 50 | | $408.56 |
| ID-46 | 4" x 6" | 5 | 50 | | |
| ID-410 | 4" x 10" | 5 | 50 | | $457.50 |
| ID-412 | 4" x 12" | 5 | 50 | | |
| ID-414 | 4" x 14" | 5 | 50 | | $922.50 |
| | | | | | |
| **Wound Pad Dressings (Moisture Control)** | | | | | |
| WPD-22 | 2" x 2" | 5 | 50 | | $236.92 |
| WPD-23 | 2" x 3" | 5 | 50 | | $337.50 |
| WPD-26 | 2" x 6" | 5 | 50 | | |
| WPD-210 | 2" x 10" | 5 | 50 | | |
| WPD-212 | 2" x 12" | 5 | 50 | | |
| WPD-38 | 3" x 8" | 5 | 50 | | $780.00 |
| WPD-310 | 3" x 10" | 5 | 50 | | |
| WPD-316 | 3" x 16" | 5 | 50 | | $1,530.00 |
| WPD-44 | 4" x 4" | 5 | 50 | | $379.08 |
| | | | | | |
| **Wound Packing Strips** | | | | | |
| WPS-124 | 1" x 24" | 5 | 50 | | |
| WPS-112 | 1" x 12" | 5 | 50 | | |
| | | | | | |
| **Adhesive Bandage Strips** | | | | | |
| AS-6001 | 1" x 3" | 150 | 750 | | |
| | | | | | |
| **Burn Contact Dressings** | | | | | |
| BCD-44 | 4" x 4" | 10 | 100 | | $379.05 |
| BCD-48 | 4" x 8" | 10 | 100 | | $568.60 |
| BCD-816 | 8" x 16" | 5 | 50 | | $1,018.73 |
| BCD-1616 | 16" x 16" | 5 | 50 | | $1,421.00 |
| BCD-2424 | 24" x 24" | 1 | 10 | | |
| | | | | | |
| **Burn Pad Dressings (Moisture Control)** | | | | | |
| BPD-44 | 4" x 4" | 5 | 50 | | |
| BPD-48 | 4" x 8" | 5 | 50 | | |

04/15/2005 09:56 AM  Case 1:07-cv-06769  Document 18-2  Filed 02/26/2008  Page 19 of 19
From: 8779782842:28638  To: NobleFiberTech  Page 18

Apr. 15. 2005 12:58PM                                                      No. 6933  P. 16/16

| BPD-816 | | 8" x 16" | 5 | 50 | | |
|---|---|---|---|---|---|---|
| **Elastic Burn Wraps** | | | | | | |
| BW-466 | | 4" x 66" | 1 | 10 | | $805.51 |
| BW-6108 | | 6" x 108" | 1 | 10 | | $1,535.21 |
| | | | | | | |
| **Acute Burn Gloves** | | | | | | |
| ABG-01PED | | Pediatric | 1 | 1 | | |
| ABG-01S | | Small | 1 | 1 | | |
| ABG-01M | | Medium | 1 | 1 | | $42.64 |
| ABG-01L | | Large | 1 | 1 | | $47.38 |
| ABG-01XL | | X-Large | 1 | 1 | | |
| ABG-01XXL | | XX-Large | 1 | 1 | | |
| | | | | | | |
| **Digit Dressing, Stretch Knit** | | | | | | |
| TSK05015 | | 1/2" x 1 1/2" | 5 | 100 | | $750.00 |
| TSK0510 | | 1/2" x 10" | 5 | 100 | | $2,250.00 |
| TSK1035 | | 1" x 3 1/2" | 5 | 100 | | $800.00 |
| TSK115 | | 1" x 15" | 5 | 100 | | $2,500.00 |
| TSK34 | | 3" x 4" | 5 | 100 | | $1,700.00 |
| | | | | | | |
| **Cast Liner** | | | | | | |
| SS-TCC-A | | 2" x 25yds | 1 | | | |
| SS-TCC-F | | 4" x 25 yds | 1 | | | |
| | | | | | | |
| **Hydrocolloid** | | | | | | |
| SS-HCD-0404 | | 4x4 | 10 | 100 | | $987.00 |
| SS-HCD-0606 | | 6x6 | 10 | 100 | | $1,913.00 |
| | | | | | | |
| **Hydrogel** | | | | | | |
| SS-HYG-0404 | | 4x4 | 10 | 100 | | $725.00 |