# EXHIBIT B part 1

52441a.txt

1

```
 1            IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3    _____

 4    ARGENTUM MEDICAL, LLC            :   NO. 07CV6769
                                       :
 5            Plaintiff                :
                                       :
 6            -VS-                      :
                                       :
 7    NOBEL BIOMATERIALS and DERMA     :
      SCIENCES, INC.                   :
 8                                     :
              Defendants               :
 9    _____

10                   *  *  *  *  *

11               TUESDAY, APRIL 29, 2008

12                   *  *  *  *  *

13            C O N F I D E N T I A L

14

15        Oral deposition of JEFFREY KEANE, was taken

16   at the law offices of Cozen & O'Connor, 1900 Market

17   Street, Philadelphia, Pennsylvania, before Renee

18   Schumann, a Notary Public of the State of New Jersey

19   and Notary Public of the Commonwealth of

20   Pennsylvania, on the above date, commencing at 3:03 p.m.

21

22               FRONTINOREPORTING, LLC
          FRONTINO/DEFILIPPIS COURT REPORTING AGENCY
23                 34 North Front Street
              Philadelphia, Pennsylvania 19106
24                    (215) 922-2133
```

Page 1

2

52441a.txt

```
 1    A P P E A R A N C E S:

 2

 3            LAW OFFICES OF ROCKEY, DEPKE & LYONS

 4        BY: JOSEPH A. FUCHS, ESQUIRE
              233 S. Wacker Drive - Suite 5450
 5            Sears Tower
              Chicago, Illinois 60606
 6            (312) 277-2006
              Representing the Plaintiff
 7

 8

 9            LAW OFFICES OF COZEN & O'CONNOR

10

11        BY: ROBERT HAYES, ESQUIRE

12            1900 Market Street

13            Philadelphia, Pennsylvania 19103

14            (215) 665-5548

15            Representing Nobel Biomaterials, Inc

16

17

18        LAW OFFICES OF AKERMAN, SENTERFITT

19

20        BY: JAMES PURCELL, ESQUIRE

21            50 N. Laura Street - Suite 2500

22            Jacksonville, Florida 32202

23            (904) 798-3730

24            In-House Counsel for Noble Biomaterials
```

3

Page 2

52441a.txt

1                         I N D E X

2

3    WITNESS                                 PAGE

4

     JEFFREY KEANE,
5
          (Witness Sworn.)
6

7
          DIRECT EXAMINATION BY MR. FUCHS      05
8

9

10                      E X H I B I T S

11
     NUMBER          DESCRIPTION          PAGE
12

13   Exhibit-1 Notification of Docket Entry  04

14   Exhibit-2 Verification                  13

15   Exhibit-3 Invoice                       17

16   Exhibit-4 Invoices/Purchase Orders      19

17   Exhibit-5 General Objections            27

18   Exhibit-6 Invoices/Purchase Orders      33

19   Exhibit-7 Medico-Mart, Inc.             37

20   Exhibit-8 Distributorship Agreement     50

21
     REQUESTS FOR PRODUCTION:
22

23          None

24


                                              4



                         Page 3

52441a.txt

```
 1              * * * * *
 2          (It is agreed by and between counsel
 3      that sealing, filing, and certification are
 4      hereby waived and all objections, except as to
 5      the form of the questions, are reserved until
 6      the time of trial.)
 7              * * * * *
 8          JEFFREY KEANE, having been duly sworn
 9      according to law, was examined and testified
10      as follows:
11              * * * * *
12          MR. FUCHS:  Let's mark this as Exhibit
13      Number 1.
14              * * * * *
15          (whereupon, Exhibit-1 was marked for
16      identification.)
17              * * * * *
18          MR. FUCHS:  This is a Notification of a
19      Docket Entry and this is basically the reason
20      that we're here today, that the Plaintiffs
21      moved for an order for an expedited discovery
22      and the Judge granted the order and has said
23      that Plaintiff is granted leave to depose
24      Jeffrey B. Keane on or before May 2, 2008.
```

5

```
 1              * * * * *
                Page 4
```

52441a.txt

2
3                           * * * * *
4    BY MR. FUCHS:
5          Q.    All right.  Mr. Keane, have you ever
6    been deposed before?
7          A.    Yes.
8          Q.    And how many times would you say you've
9    been deposed?
10         A.    Once.
11         Q.    So can you state your name and spell it
12   for the record?
13         A.    Jeffrey Keane, J-E-F-F-R-E-Y,
14   K-E-A-N-E.
15         Q.    Can you tell me your home address?
16         A.    224 Mansfield Avenue, Darien,
17   Connecticut, D-A-R-I-E-N, 06828.
18         Q.    Can you give me a brief synopsis of
19   your positions you've held from after college to your
20   present position?
21         A.    Graduate school, MBA, Emory University.
22   Marketing positions, General Mills.  Marketing in
23   general management positions, National Foods, Inc.
24   General management positions, Playtex Products, Inc.

6

1    General management positions, Minami, Inc.,
2    M-I-N-A-M-I. General management positions, Somerset,
                              Page 5

52441a.txt

3    and currently CEO of Noble Biomaterials, Inc.

4         Q.    Can you give me a brief, I guess,

5    history of Noble Biomaterials or can you describe the

6    corporate forum of Nobel Biomaterials?

7         A.    Can you help me with that question?

8    I'm not quite sure what you mean.

9         Q.    Sure.  I am just wondering if you have

10   any subsidiary companies or if it's a single, Noble

11   Biomaterials, is that the only corporate entity for

12   which you work?

13        A.    Noble Biomaterials, Inc. is the

14   formalized umbrella corporation.  Underneath that is

15   two corporate entities, Noble Fiber Technologies and

16   Sauquoit Industries.

17        Q.    And can you tell me the nature of

18   Noble's business?

19        A.    We are in the business of metallizing

20   nylon.

21        Q.    And in particular, can you elaborate a

22   little bit on Noble Fiber Technologies?

23        A.    Maybe you could help me with that

24   question.

7

1         Q.    Okay.  Well, what is the difference

2    between Noble Fiber Technologies and Sauquoit?

3                     I'm trying to get an idea of how the
                              Page 6

52441a.txt

```
 4    product lines are differentiated between those two
 5    companies?
 6          A.      They're not.  The two companies were
 7    merged from an operating standpoint and so though the
 8    two companies exist legally from an operating vantage
 9    point, there's no differentiation between the two
10    corporate entities.
11          Q.      Are they both Delaware corporations?
12          A.      That's correct.
13                  MR. HAYES:  I think they're LLCs
14          actually.
15                  MR. FUCHS:  Okay.
16                  MR. PURCELL:  Bob?
17                  MR. HAYES:  Yes.
18                  MR. PURCELL:  Those are -- the
19          underlying LLCs are Pennsylvania LLCs.
20                  MR. FUCHS:  Okay.  Thank you.
21    BY MR. FUCHS:
22          Q.      Can you tell me what silver nylon
23    products Noble Biomaterials sells?
24          A.      We sell a filament based product, a
```

8

```
 1    staple based product, a foam based product and
 2    additionally we sell finished wound care products.
 3          Q.      And I notice that there were some
 4    products dealing with sport goods like clothing and
```

Page 7

52441a.txt

5    that kind of thing, where would that fall within

6    your -- those items you just mentioned?

7           A.    We don't sell those directly.  Those

8    are sold by licensees of ours who make use of that

9    filament, staple or foam product.

10          Q.    What products in the wound care

11   division of Noble Biomaterials do you sell?

12          A.    Maybe you can be more specific.

13          Q.    Well, you have silver nylon wound

14   management products, can you identify those by name?

15          A.    Today we sell to the wound care

16   marketplace in two fashions.  One is we are a

17   supplier of silver nylon products to licensees, and

18   then additionally we sell finished products under the

19   brand name of SilverSeal.

20          Q.    Of the supplier of the silver nylon

21   products, can you identify the distributors you use

22   for that particular product?

23                MR. HAYES:  What product are you

24        talking about?

9

1                MR. FUCHS:  I'm talking about the

2        supplier where you sell silver nylon that's

3        not in a completed state.

4                MR. HAYES:  That's beyond the scope of

5        jurisdictional discovery.

52441a.txt

6          MR. FUCHS:  I disagree with that.

7          MR. HAYES:  On what basis?

8          MR. FUCHS:  Well, the idea here is that

9     jurisdiction can be based on specific or a

10    general jurisdiction.  So if Noble is doing

11    business in a regular fashion with the State

12    of Illinois, that would establish jurisdiction

13    regardless of whether it is a finished nylon

14    product or whether it falls under the patent.

15         MR. HAYES:  I disagree that the sale of

16    products to a distributor -- there's no

17    reasonable basis to argue that would satisfy

18    general jurisdiction.  I think it's beyond the

19    scope of jurisdictional discovery consistent

20    with the Court's order.

21         I'll instruct the witness not to answer

22    the question.

23         MR. FUCHS:  What I think we should do

24    is as long as we are going to have this

10

1     objection, because I see this is going to

2     be -- I figured based upon your answering of

3     the document request and the Interrogatories

4     relating to personal jurisdiction or specific

5     jurisdiction and not to general I thought this

6     objection may come up.

Page 9

52441a.txt

7        So I think we should probably try to

8    get Judge Lindberg on the phone and have him

9    resolve it right now.  I have the number right

10   here.

11                    * * * * *

12       (Whereupon, we went off the record to

13   call Judge Lindberg.)

14                    * * * * *

15       MR. FUCHS:  We are going to resume.  We

16   attempted to call Judge Lindberg's chambers

17   and we reached Judge Lindberg's voicemail

18   message, outgoing message.

19       So we were unable to resolve the issue

20   of whether or not we can inquire into issues

21   of general jurisdiction, and Mr. Hayes has

22   stated that we're going to be limited to

23   inquiring on issues to specific jurisdiction.

24       MR. HAYES:  No, that's not my position.

11

1        MR. FUCHS:  Okay.

2        MR. HAYES:  You're certainly entitled

3    to inquire as to both general and specific

4    jurisdiction.  I think the case law is well

5    settled, however, the general jurisdiction you

6    must show continuous ongoing activity itself

7    within the State of Illinois such as offices

Page 10

52441a.txt

8      there, regular place of business, that type of

9      thing.  If you want to ask questions along

10     those lines, you are certainly entitled to do

11     so.

12            However, to the extent that you want to

13     pursue questions of specific jurisdiction,

14     that would relate to the products that are

15     alleged to infringe the patent, which I

16     understand you claim generally are wound care

17     products which consist of those dressings that

18     would be applied directly to the wound, and

19     you allege certain other products like the

20     underliner -- cast underliner and I believe

21     the burn gloves also infringe; so, we provided

22     information about that.

23            I don't know if the witness has this

24     information, but as a compromise to try to

12

1      move this along if you want to ask where

2      distributors of other such products are

3      located without their names, which is

4      confidential information, and we

5      certainly even though we have a

6      confidentiality stipulation I don't think even

7      pursuant to that stipulation that we should

8      have to produce -- provide information that's

Page 11

52441a.txt

```
9        to a competitor's attorney that's not relevant
10       to the jurisdiction.
11            But anyway, if you want to ask where
12       distributors are located and if the witness
13       can provide that information I will allow him
14       to answer that as a compromise to try to move
15       this thing along.
16            MR. FUCHS:  I'm going to disagree.  I
17       will try to move along, but I believe the case
18       law supports that if you put a product in the
19       stream of commerce and it makes its way into
20       Illinois, that is sufficient to establish
21       personal jurisdiction either general or
22       specific, but I'll move on.
23            I'm going to mark what is entitled
24       Verification of Jeffrey B. Keane in Support of
```

13

```
1        Defendant Noble Biomaterials, Inc.'s Motion to
2        Dismiss Or Transfer.
3                    * * * * *
4            (Whereupon, Exhibit-2 was marked for
5        identification.)
6                    * * * * *
7   BY MR. FUCHS:
8        Q.    Mr. Keane, I'm going to hand you what
9   is marked as Exhibit Number 2.  I just want to see if
```
Page 12

52441a.txt

10   you're familiar with this document.

11        A.    Yes, I'm familiar with this document.

12              MR. HAYES:  Off the record for another

13        second.

14                    * * * * *

15              (Whereupon a discussion was held off

16        the record.)

17                    * * * * *

18   BY MR. FUCHS:

19        Q.    Were you involved with the preparation

20   of this document?

21        A.    Yes.

22        Q.    And did you have any help from any

23   non-attorney in preparing this document?

24        A.    Yes.

14

1         Q.    Can you identify those people that were

2    involved?

3         A.    Specific names?

4         Q.    Yes, and positions, please.

5         A.    In addition to attorneys.

6         Q.    No, not including attorneys.

7         A.    Ron Flormann, who is general manager of

8    our wound care division.  Jeff Glattely, who is

9    director of marketing for our wound care division.

10   Jim Walsh, who is our chief financial officer.  Joel

Page 13

52441a.txt

11   Furey, who is our EVP of business development.  Gail

12   Prymock, who is our customer service representative.

13   To my knowledge, that's the list.

14        Q.   So it would be Ron Flormann --

15        A.   Excuse me, there would be one more.

16        Q.   Okay.

17        A.   Pat Davidson, who is our legal

18   assistant and not a lawyer.

19        Q.   Okay.  Thank you.

20             So other than Ron Flormann, Jeff

21   Glattely, Jim Walsh, Joel Furey, Gail Prymock and Pat

22   Davies --

23        A.   Davidson.

24        Q.   Pat Davidson, thank you.  Can you think

15

1    of anybody else that may have been involved?

2         A.   At this point in time, no.

3         Q.   Do you have anything to help you

4    remember?  Do you have any notes or anything that

5    would help you to refresh your recollection?

6         A.   I do not have any notes to refresh my

7    recollection.  Having said that, there were aspects

8    of the data collection where there may have been --

9    these people may have asked others to cooperate in

10   that effort.

11        Q.   I understand.

Page 14

52441a.txt

12              Did you contact any distributors of

13   Noble for the purpose of answering or for filling out

14   this verified statement?

15         A.    I did not directly contact anyone.  I

16   think within that group of people there was a

17   conversation with Derma Sciences to determine what

18   their initiatives, if any, were.

19         Q.    Do you know who had that conversation?

20         A.    No, I don't.

21         Q.    Can you tell me what Noble's practices

22   are in selling its wound care products?

23         A.    Can you be more specific?

24         Q.    Sure.  How are the orders taken?

16

1          A.    The majority of our orders are

2    received -- are placed by a distributor directly to

3    us.  We will process that order through our customer

4    service department.  If we have the inventory, ship

5    it.  If we don't have the inventory, order it and we

6    will then ship it to that distributor, typically FOB

7    Scranton and that's our order fulfillment process.

8          Q.    Do you take orders by telephone?

9          A.    Yes.

10         Q.    Do you take them by e-mail?

11         A.    Yes.

12         Q.    And fax?

Page 15

52441a.txt

13      A.      Yes.

14      Q.      And e-mail or electronically?

15      A.      Through e-mail, yes.  Not EDI, not

16   electrical data interface, no.

17      Q.      Do you take any orders from the

18   internet?

19      A.      No.

20      Q.      What documents are prepared in

21   processing these orders?

22      A.      We have within our order entry system

23   essentially a report that lists each of the entries

24   by a specific item number, and that is essentially

17

1    our manifest that drives our fulfillment process.

2       Q.      What specific documents though like --

3    do you have invoices, bill of ladings, purchase

4    orders, that kind of thing?

5               Can you take me through the process

6    from the time you receive an order to the time it's

7    shipped?

8       A.      I can't, no.

9       Q.      How come you can't?

10      A.      I don't know it.

11      Q.      You don't know the process?

12      A.      No.

13      Q.      Who would know that process?

52441a.txt

14        A.      I would -- our order entry people would
15    know that.
16                MR. FUCHS:  I'm going to ask the court
17          reporter to mark Exhibit Number 3 documents
18          produced under Bates Numbers N000068 through
19          N0069.
20                      * * * * *
21                (Whereupon, Exhibit-3 was marked for
22          identification.)
23                      * * * * *
24    BY MR. FUCHS:


                                                          18


1         Q.      I'm going to show you what has been
2    marked as Exhibit Number 3, and it says at the
3    caption -- it says invoice and it has invoice number
4    258075 and it's addressed to Edgepark,
5    E-D-G-E-P-A-R-K, all one word, Surgical of 1810
6    Summit Commerce Park, Twinsburg, Ohio.
7                Can you tell me what that document is?
8         A.      No, I cannot.
9         Q.      Have you ever seen this type of
10    document?
11        A.      No, I haven't.
12        Q.      Is it possible that this is a Noble
13    invoice?
14        A.      Possible.
                        Page 17

52441a.txt

15          Q.      One thing I noticed on this document is
16   that the invoice has -- it says bill to Edgepark
17   Surgical, and then on page N69 it's delivered to RGH
18   Horned Frog Medical in Fort Worth, Texas.
19                 Do you understand why that would be
20   done?
21          A.      No, I don't.
22                 MR. FUCHS:  I'm going to ask the
23          reporter to mark Exhibit Number 4, documents
24          Bates Numbered N000092 through N000102.


                                                       19



1                        * * * * *
2                 (Whereupon, Exhibit-4 was marked for
3          identification.)
4                        * * * * *
5    BY MR. FUCHS:
6          Q.      Okay.  I'm going to show you what has
7    been marked as Exhibit Number 4; and, again, this has
8    a caption, invoice and it says bill to Edgepark
9    Surgical, that's on page 92.
10                 Are those Noble documents?
11         A.      Possibly.
12         Q.      I'm looking at page N92.  You have
13   under item number it has the SS-WCD-0404.  Can you
14   tell me what that refers to?
15         A.      No, I cannot.
                        Page 18

52441a.txt

16          Q.      Do you know anybody who could tell us
17   what that refers to?
18          A.      Possibly.
19          Q.      Who would that be do you think?
20          A.      Customer service people.
21          Q.      All right.  Can I direct your attention
22   to N97 within Exhibit Number 4.  Have you ever seen
23   this document before?
24          A.      No.

                                                        20

1          Q.      Do you know who generated this
2    document?
3          A.      No.
4          Q.      Do you think this is a Noble document?
5          A.      I don't know.
6          Q.      Do you see under the caption silver
7    contact layer dressings?
8          A.      Yes.
9          Q.      There's a reference under the column
10   headed by HCPC the number A6207 and it has
11   manufacturer, Care Medical; item number WCD412 and
12   then Silverlon contact.
13                 Do you understand why this would -- why
14   Silverlon would appear in this document?
15          A.      No.
16          Q.      Can you tell me who sells Noble's

52441a.txt

17    products?

18          A.    Would you be more specific?

19          Q.    Sure.  Let's start with the wound care

20    products.

21          A.    Can you be more specific?

22          Q.    Well, let's talk about Noble direct

23    sales first.  Does Noble have a direct sales force?

24          A.    For which products?

21

1          Q.    For its wound care products.

2          A.    Again, which wound care products?

3          Q.    Sold under the SilverSeal name.

4          A.    Yes, we do.

5          Q.    How many people are involved with that

6    sales effort?

7          A.    Direct sales?

8          Q.    Yes.

9          A.    Two.

10          Q.    Can you tell me their names?

11          A.    Ron Flormann, Jeff Glattely.

12          Q.    Do you know how they go about making

13    sales of Noble's wound care products under the

14    SilverSeal name?

15          A.    Can you be more specific?

16          Q.    What is the nature of their sales

17    activities?

52441a.txt

18      A.      I still don't understand the question.

19      Q.      How do they go about generating

20 business for Noble?

21      A.      They primarily spend their time

22 identifying distributors that will sell the

23 SilverSeal wound care products to users.

24 Additionally, there are some accounts where we

                                                    22

1 service directly not through a distributor.  That's a

2 minority of their time.

3      Q.      Do you know -- can you identify the

4 names of the companies where you sell directly to or

5 Noble sells directly to these people?

6      A.      I can identify one, but it won't be

7 exhaustive.

8      Q.      Who is that one?

9      A.      That would be Mercy Hospital.

10      Q.      Where are they located?

11      A.      In Pennsylvania.

12      Q.      Can you tell me the number of sales

13 offices you have for Noble?

14      A.      Can you be more specific in terms of

15 which products?

16      Q.      For any of its products.

17      A.      Do you want that -- can you give me a

18 definition of sales office?

52441a.txt

19      Q.      It could be somewhere where people work

20  in order to generate orders, could be their homes,

21  could be official offices with Noble signage,

22  anything like that?

23              MR. HAYES:  Objection to the question

24          as vague and ambiguous.  Overbroad.  You can

23

1           answer it.

2               THE WITNESS:  I don't understand the

3           question.

4               MR. HAYES:  Are you asking what offices

5           Noble maintains?

6               MR. FUCHS:  Yes.

7               THE WITNESS:  We have an office in

8           Scranton, Pennsylvania.  We have an office,

9           official office, in Veneziano, Italy.  Then we

10          have people around the globe working out of

11          their homes.

12  BY MR. FUCHS:

13      Q.      For the people in the United States

14  working from their offices, how many people does that

15  include?

16      A.      A range of -- because I don't have the

17  exact number, between 10 and 15.

18      Q.      And do you know the location of these

19  offices or these home offices?

Page 22

52441a.txt

20          MR. HAYES:  Objection to the form of

21     the question.  Assumes facts not in evidence.

22     You can answer.

23          THE WITNESS:  No, I don't know them

24     all.

24

1  BY MR. FUCHS:

2          Q.     Do you know if any of them are in

3  Illinois?

4          A.     Yes, and there are none.

5          Q.     So you know they are not in Illinois,

6  but you don't know exactly where they are, correct?

7          A.     Correct.

8          Q.     How do you know that they're not in

9  Illinois?

10          A.     Because we checked.

11          Q.     How did you check?

12          A.     We went through our employee list.

13          Q.     Let's talk about authorized

14  distributors.  How does someone become an authorized

15  distributor of Noble products?

16          A.     Would you be more specific in terms of

17  products?

18          Q.     Any of Noble's products.

19          THE WITNESS:  In becoming a distributor

20     for SilverSeal we determine if it's a

52441a.txt

21          qualified business partner, the kinds of end
22          customers that they access, the business
23          philosophy and the way that they do business,
24          whether they have appropriate credit terms.

                                                    25

1    BY MR. FUCHS:
2          Q.     How do you -- what else has to occur?
3                 Do you have to have a signed agreement
4    for them to become authorized distributors?
5          A.     Typically yes, but not always.
6          Q.     What instances have you not had a
7    signed agreement?
8          A.     Historically there have been some
9    handshake agreements for distribution of some of the
10   wound care products.  At present, all distribution is
11   formalized with a written agreement.
12         Q.     Can you identify the companies with
13   which you have a handshake agreement with?
14         A.     To the best of my knowledge, we have
15   none currently, so we don't have any distributors
16   with handshake agreements on SilverSeal wound care
17   products.
18         Q.     So the list of people who distribute
19   the SilverSeal product will be different from the
20   list of people that distribute other of Noble's
21   products?
                        Page 24

5244la.txt

22      A.      Possibly.

23      Q.      Do you know where the authorized

24  distributors are located for the SilverSeal product?

26

1       A.      Exhaustively, no.

2       Q.      Do you know if any are in Illinois?

3       A.      Yes.

4       Q.      And are any in Illinois?

5       A.      No.

6       Q.      How do you know that?

7       A.      We checked.

8       Q.      Who checked?

9       A.      That same list of people that we

10  identified earlier.

11      Q.      Okay.  Do you know if any of your

12  distributors -- strike that.

13              Do any of your distributors of the

14  SilverSeal product have warehouses in Illinois?

15      A.      I wouldn't know that.

16      Q.      Do you know if any of your distributors

17  target sales in Illinois?

18      A.      I wouldn't know that.

19      Q.      Do you know who would know that?

20      A.      Yes.

21      Q.      Who would that be?

22      A.      The distributors.

                        Page 25