**EXHIBIT B part 2**

52441a.txt

23          Q.      Anybody within Noble that would know

24    that?

27

1           A.      Not necessarily.

2           Q.      So you don't know whether any of your

3     distributors target Illinois?

4           A.      That's correct.

5                   MR. FUCHS:  I'm going to mark what is

6                   captioned Answers and Objections of Defendant

7                   Noble Biomaterials, Inc. to Plaintiff,

8                   Argentum Medical, LLC's Jurisdictional

9                   Interrogatories.

10                                  * * * * *

11                  (Whereupon, Exhibit-5 was marked for

12                  identification.)

13                                  * * * * *

14    BY MR. FUCHS:

15          Q.      I'm going to show you what I've marked

16    as Exhibit Number 5 and ask you if you have seen this

17    before?

18          A.      Yes, I recognize this document.

19          Q.      Okay.  Can you direct your attention

20    to -- it doesn't have numbers on it, but it's page 2

21    where it starts Interrogatory Number 1, it states:

22    State the name and address of each seller,

23    distributor and/or reseller of number one; Noble

52441a.txt

24   products; and number two, SilverSeal products.


                                                    28



1                And then in response to that on the
2    next page you said that the defendant responds that
3    the following entity serve as distributors of Noble's
4    wound dressings, burn gloves and/or undercast liner.
5    And then under that you have 15 distributors
6    identified on the next three pages.
7                Is this a complete list of Noble's
8    distributors?
9         A.    Yes, for SilverSeal products.
10        Q.    How do you know that?
11        A.    We checked our records of whom we sell
12   to.
13        Q.    Do you have a distributorship agreement
14   with each of these entities?
15        A.    I don't know that.
16        Q.    I'm going to direct your attention to
17   page 4 of this document and we have three entities in
18   the middle of the page, AliMed, Juzo, Inc. and
19   Medico-Mart.  There were no distributorship
20   agreements produced for these parties or these
21   entities, do you know why that is?
22        A.    No, I do not.
23        Q.    Do you know if any of these exist?
24        A.    No, I do not.
                      Page 27

52441a.txt

29

```
1        Q.      Presumably since they are authorized
2   distributors they would have an agreement, wouldn't
3   you say it's fair to say?
4        A.      Can you be more specific in the
5   question?
6        Q.      Earlier you testified that in order to
7   be an authorized distributor of SilverSeal products
8   you have to sign a distributorship agreement and that
9   you had no handshake deals.
10              MR. HAYES:  Objection.  It misstates
11              the witness's testimony.
12  BY MR. FUCHS:
13       Q.      Isn't that correct?
14       A.      What I said was that to the best of my
15  knowledge we didn't have any handshake deals on
16  SilverSeal wound care products.
17       Q.      Your deal with AliMed, do you have a
18  distributorship agreement with AliMed?
19       A.      I don't know.
20       Q.      Who would know?
21       A.      Our legal counsel.
22       Q.      Anybody else?
23       A.      Our legal counsel.
24       Q.      Nobody within Noble?
```

52441a.txt

⬜

30

1          A.     Not necessarily, no.

2          Q.     What about Jeff Glattely, would he have

3    an idea of whether or not there is a distributorship

4    agreement between AliMed and Noble?

5          A.     Maybe.

6                 MR. HAYES:  Objection to the question.

7          You're asking the witness to speculate.

8    BY MR. FUCHS:

9          Q.     You testified earlier that Jeff

10   Glattely one of his primary jobs was to try to sign

11   up qualified distributors of the Noble SilverSeal

12   products; isn't that correct?

13         A.     Yes.

14         Q.     Do you know if Jeff Glattely has had

15   any interaction with AliMed?

16         A.     No, I do not.

17         Q.     Would Jeff Glattely be the person who

18   would most likely know the answer to whether or not a

19   distributorship agreement existed between Noble and

20   AliMed?

21                MR. HAYES:  Objection.  Asked and

22         answered.  It misstates the witness's

23         testimony.

24                THE WITNESS:  Maybe.

Page 29

52441a.txt

31

```
 1    BY MR. FUCHS:
 2         Q.    why do you say maybe?
 3         A.    Ron Flormann may be the person who
 4    dealt with it or this may be a preexisting
 5    relationship that we had either to Jeff Glattely or
 6    Ron Flormann joining us.
 7         Q.    would your testimony be the same for
 8    Juzo, Inc., who would be the person from Noble most
 9    knowledgeable about whether there is a
10    distributorship agreement between Juzo and Noble
11    Biomaterials?
12         A.    Legal counsel.
13         Q.    And anyone from Noble?
14         A.    Same two people.
15         Q.    Ron Flormann and Jeff Glattely?
16         A.    Correct.
17         Q.    And would that also be the same for
18    Medico-Mart?
19         A.    That's correct.
20         Q.    Do you know if any of the authorized
21    distributors identified have any employees from
22    Illinois?
23         A.    No, I do not.
24         Q.    Do you know if they have any warehouses
```

Page 30

52441a.txt

32

1    in Illinois?

2          A.     No, I do not.

3          Q.     Do you know if any of these authorized

4    distributors have any sales offices in Illinois?

5          A.     No, I do not.

6          Q.     And do you know whether any of these

7    authorized distributors have any contacts at all in

8    Illinois?

9          A.     Can you be more specific?

10         Q.     Any business relationships where they

11   sell SilverSeal product into Illinois.

12         A.     We do not sell SilverSeal products into

13   Illinois.

14         Q.     Do you have a prohibition against

15   selling SilverSeal products into Illinois?

16         A.     No, we do not.

17         Q.     Does Noble offer the SilverSeal product

18   for sale over the internet?

19              MR. HAYES:  Objection to the question.

20         Vague and ambiguous.

21              MR. FUCHS:  You can answer.

22              THE WITNESS:  We sell an athletic sock

23         via the internet, but we do not sell any

24         SilverSeal products via the internet.

33

Page 31

52441a.txt

```
 1   BY MR. FUCHS:
 2          Q.     Do you know if any of your
 3   distributors, authorized distributors, that are
 4   identified here in response to Interrogatory Number 1
 5   whether any of them sell the SilverSeal product over
 6   the internet?
 7          A.     No, I do not.
 8                 MR. FUCHS:  I'm going to ask the court
 9          reporter to mark as Exhibit Number 6 a
10          document Bates Numbered N152 through N162,
11          omitting the leading zeros.
12                        *  *  *  *  *
13                 (Whereupon, Exhibit-6 was marked for
14          identification.)
15                        *  *  *  *  *
16   BY MR. FUCHS:
17          Q.     Have you had a chance to look that
18   over, Mr. Keane?
19          A.     Yes.
20          Q.     I would like to direct your attention
21   to the document with Bates Number N157.
22          A.     (Witness complies.)
23          Q.     It's entitled purchase order, it also
24   has the company name Medico-Mart, Inc.
```

□

34

52441a.txt

1                Have you ever seen this document
2    before?
3        A.    I have not.
4        Q.    Do you see on the right-hand side under
5    where it says F.O.B., it's in the second block, it
6    says shipping point prepay and add?
7        A.    Yes.
8        Q.    Do you have any idea of what that
9    means?
10       A.    It's referencing how it's going to be
11   shipped and who is going to pay.
12       Q.    What does that mean, how is it going to
13   be shipped according to this?
14       A.    I don't know that.
15       Q.    Let's move on to N158.
16       A.    (Witness complies.)
17       Q.    It's entitled invoice and it's number
18   257881, and it refers to sales order number 185262.
19   Do you see that, Mr. Keane?
20       A.    Yes.
21       Q.    And also, if you can switch back to
22   page N157.  At the top in the first block on the
23   right-hand side it says P.O. number 87837.
24       A.    Yes.

⬜

35

52441a.txt

1       Q.     So that number matches the number that

2  is on the invoice on N158, wouldn't you agree?

3       A.     They are the same numbers.

4       Q.     Is it fair to say that this invoice at

5  N158 is responsive to the purchase order at N157?

6       A.     Can you be more specific in your

7  question?

8       Q.     That it refers to that purchase order?

9       A.     Maybe.

10      Q.     Is it possible that this is a Noble

11  invoice that is documenting the purchase order placed

12  by Medico-Mart?

13      A.     It's possible.

14      Q.     And also moving on to N159, it's

15  another purchase order from Medico-Mart number 88927,

16  and then the following page, Bates Numbered N160 it's

17  an invoice that refers to purchase order 88927.

18          Is it possible that this is a Noble

19  invoice on N160 that is referencing a purchase order

20  sent by Medico-Mart at N159?

21      A.     It's possible.

22      Q.     And the date requested of that is on

23  February 29, 2008 according to document N159?

24      A.     That's correct.

36

52441a.txt

1        Q.    And then on the invoice at N160 the

2   shipping date is February 26, '08?

3        A.    That's correct.

4        Q.    Do you know anything about

5   Medico-Mart's business?

6        A.    I do not.

7        Q.    Have you ever met with anybody at

8   Medico-Mart?

9        A.    No.

10        Q.    Would you be surprised to know that

11   Medico-Mart targets Illinois for sales of the

12   SilverSeal product?

13        A.    Could you be more specific in the

14   question?

15              MR. HAYES:  Object to the question.

16   BY MR. FUCHS:

17        Q.    Would you be surprised that Medico-Mart

18   states that it's business is it offers a complete

19   line of medical/surgical, laboratory and

20   pharmaceutical products to physician offices and

21   clinics throughout Wisconsin, northern Illinois and

22   southeastern Minnesota?

23              MR. HAYES:  Object to the form of the

24              question.  Assumes facts not in evidence.

37

1              MR. FUCHS:  Please mark this as Exhibit

Page 35

52441a.txt

2          Number 7.  This is a printout from a web page

3          at www.medicomart.com and it states that --

4          you can read it, please.

5                    THE WITNESS:  (Witness complies.)

6          Okay.

7                              * * * * *

8                    (Whereupon, Exhibit-7 was marked for

9          identification.)

10                             * * * * *

11   BY MR. FUCHS:

12          Q.     This is the same Medico-Mart that

13   distributes SilverSeal products, is it not?

14                    MR. HAYES:  Object to the form of the

15          question.  Lack of foundation.

16                    THE WITNESS:  I don't know.

17   BY MR. FUCHS:

18          Q.     Do you see down below under 2008

19   copyright it says Medico-Mart, Inc., 2323 Corporate

20   Drive, Waukesha, Wisconsin on Exhibit Number 7?

21          A.     I do.

22          Q.     And then going back to the

23   Interrogatory responses marked with Exhibit Number 5

24   on page 3 of Exhibit Number 5, fourth name down on

38

1    the list.

2          A.     Yes.

                        Page 36

52441a.txt

3      Q.      It appears that the Medico-Mart

4  referenced in Exhibit Number 7 is the same

5  Medico-Mart that is an authorized distributor for

6  Noble?

7      A.      The addresses are the same.

8      Q.      Sir, are you surprised to know that the

9  Medico-Mart that appears to be the same distributor

10 of SilverSeal products is targeting Illinois for

11 sales?

12              MR. HAYES:  Objection.  Misstates the

13         terms of the document.  Lack of foundation.

14              THE WITNESS:  The document also says

15         that they target using your term Wisconsin and

16         southeastern Minnesota.

17              MR. FUCHS:  Correct.  That's correct.

18 BY MR. FUCHS:

19      Q.      So it does not come as a surprise to

20 you that one of your distributors is targeting

21 Illinois?

22              MR. HAYES:  Objection to the form of

23         the question.  It misstates the terms of the

24         document.  The document in no way states

39

1         targets Illinois.

2  BY MR. FUCHS:

3      Q.      All right.  The document says that

Page 37

52441a.txt

4  Medico-Mart offers a complete line of

5  medical/surgical, laboratory and pharmaceutical

6  products to physician offices and clinics throughout

7  Wisconsin, northern Illinois and southeastern

8  Minnesota.  Are you at all surprised by that?

9        A.    No.

10       Q.    Would you be surprised to know that

11 SilverSeal product is -- strike that.

12             Would you be surprised if I told you

13 that Noble's SilverSeal's products are being sold in

14 Illinois?

15       A.    Yes.

16       Q.    Why would you be surprised?

17       A.    In our checking with our internal

18 records we have no record of ever having shipped any

19 product to Illinois, SilverSeal product to Illinois.

20             In checking through past invoices and

21 checking through sales history, we have no records of

22 selling SilverSeal into Illinois, ever shipping

23 SilverSeal product to Illinois in any of our dealings

24 with SilverSeal into the State of Illinois.

40

1        Q.    Do you receive any reports from your

2  distributors, your authorized distributors that you

3  identified in response to Interrogatory Number 1

4  whether they sell products into Illinois?

Page 38

52441a.txt

5          A.      Not to the best of my knowledge, no.

6          Q.      Is there any sales tracking information

7    such as that would identify the end users of these

8    products, you know, where the distributor sells to an

9    end user, do they identify to you that information?

10         A.      No, they don't.

11         Q.      So if they were selling it into

12   Illinois you really would not know?

13                 If an authorized Noble distributor of

14   SilverSeal product were to sell product into Illinois

15   you would not know of that sale?

16         A.      That's possible.

17         Q.      You would only know of Noble's direct

18   sales to Illinois?

19                 MR. HAYES:  Object to the form of the

20         question.  Misstates the witness's testimony.

21   BY MR. FUCHS:

22         Q.      What particular sales of the Noble

23   SilverSeal product would you know of -- let me

24   restate the question.


                                              41



1                  What would be the nature of the sales

2    of Noble's SilverSeal products where you would know

3    the specific state that the products are shipped to?

4          A.      If we sold it directly or if we drop

5    shipped it for a distributor customer we would know

                    Page 39

52441a.txt

6    potentially the end customer address, and at that

7    point in time would be able to see precisely where

8    that product ended.

9              Additionally, we do have contact with

10   distributors to determine the geographic location of

11   sales, and in preparation for this meeting we did

12   check with distributors to determine whether sales

13   were made into Illinois.

14        Q.    And what distributors did you check

15   with?

16        A.    Primarily Derma Sciences.

17        Q.    Did you check with Medico-Mart?

18        A.    I don't know that.

19        Q.    Of any of the other distributors that

20   are identified in response to Interrogatory Number 1,

21   can you tell me which of those that you consulted

22   with?

23        A.    I personally have knowledge of Derma

24   Sciences specifically.  It is possible that someone

□

42

1    within our SilverSeal team had a broader contact with

2    distributor above and beyond Derma Sciences.

3         Q.    Could you identify any of the other

4    distributors on this list that you believe had been

5    contacted?

6         A.    I cannot directly, no.

Page 40

52441a.txt

```
 7          Q.      Who would be the person who would have
 8  contacted them?
 9          A.      The various people that we had
10  mentioned previously on that list.
11          Q.      So Ron Flormann?
12          A.      Correct.
13          Q.      Jeff Glattely?
14          A.      Correct.
15          Q.      Jim Walsh?
16          A.      No.
17          Q.      Joel Furey?
18          A.      Yes.
19          Q.      Gail Prymock?
20          A.      Yes.
21          Q.      Pat Davidson?
22          A.      Correct.
23          Q.      But they didn't report back to you
24  or -- let me ask you this, did these people report
```

                                                              43

```
 1  back to you on their discussion with the
 2  distributors?
 3          A.      There were non-specific, non-named
 4  conversations about other distributors that produced
 5  the point of view that SilverSeal products were not
 6  sold in Illinois.
 7          Q.      What documents did you check from Noble
```

Page 41

52441a.txt

8  to determine whether the products were sold into

9  Illinois, sold or shipped into Illinois?

10        A.    We checked our invoices, our internal

11 sales tracking system and our ship-to manifests.

12        Q.    Who checked the invoices on behalf of

13 Noble?

14        A.    People on that team.

15        Q.    Who are those people?

16        A.    The same ones we just went through.

17        Q.    Okay.  How about the internal sales

18 tracking software?

19        A.    Same group of people.

20        Q.    Now, what about the ship-to manifest?

21        A.    Same group of people.

22        Q.    What is the ship-to manifest?

23              Can you give me an idea of what this

24 manifest looks like?

44

1        A.    No, I've never seen it.

2        Q.    Do you know if it identifies the

3  product that is being shipped?

4        A.    Yes, it does.

5        Q.    It does.

6              Do you know what else it identifies?

7        A.    I do not.

8        Q.    Presumably the addressee?

Page 42

52441a.txt

9      A.      That is correct.

10      Q.      Was there any limitation in your search

11   for -- of the shipped to manifest as far as dates?

12      A.      No, there was not.  We checked all

13   available data across available tracking regardless

14   of dates.

15      Q.      Did you restrict the search to

16   shipments of the SilverSeal product?

17      A.      Yes, that's correct.

18      Q.      So if there were another Noble product,

19   let's say socks or other Noble product, fibers that

20   shipped to Illinois, you would have not identified

21   that as a sale in Illinois?

22      A.      That's correct.

23      Q.      Do you know whether or not there were

24   any such sales in Illinois?

45

1              MR. HAYES:  Object to the form of the

2        question.  There is no testimony that Noble

3        sells socks.

4              MR. FUCHS:  I think Mr. Keane did

5        testify earlier about a sock.

6   BY MR. FUCHS:

7        Q.     Didn't you, Mr. Keane?

8        A.     I did.

9              MR. HAYES:  That Noble sells socks as a

Page 43

52441a.txt

10          finished product.

11                  THE WITNESS:  Yes.

12  BY MR. FUCHS:

13          Q.      Do you know whether or not Noble has

14  ever shipped or sold its socks in Illinois?

15          A.      Given we've sold two pair, I'm betting

16  it's not Illinois.

17          Q.      Okay.  I thought you sold a bunch of

18  the pairs to the Army?

19          A.      We don't sell the socks.  The testimony

20  you were referencing was a question asked about the

21  internet and we currently have an internet operation

22  that does make available athletic socks.  To date we

23  sold two pair.

24          Q.      Did Noble's shipping manifest or

46

1  ship-to manifest identify Illinois as an addressee

2  for any of its products?

3          A.      I don't know.  I would speculate it

4  would though because we have customers there.

5          Q.      And customers for what products?

6          A.      Noble products.

7          Q.      Can you be more specific, which Noble

8  products?

9          A.      Silver-based nylon products.

10          Q.      Could you tell me the name of those

Page 44

52441a.txt
11    customers?

12            MR. HAYES:  Object to the question.

13        It's beyond the scope of jurisdiction.

14            MR. FUCHS:  Here is where we get into

15        the disagreement again.  Are you going to

16        instruct the witness not to answer?

17            MR. HAYES:  Yes.  You already asked

18        questions about the distributors and I let it

19        go to that extent, so what would be the

20        significance of their names?

21            MR. FUCHS:  If they're selling

22        silver-based nylon products into Illinois, as

23        Mr. Keane has just testified, it may be of

24        sufficient quantities to justify having

47

1        general jurisdiction over Noble.

2            MR. HAYES:  I disagree that that would

3        be sufficient basis for general jurisdiction.

4        That still doesn't change the fact that what

5        does the name add to the mix?

6            In other words, why does it matter what

7        the names are?

8            MR. FUCHS:  I think initially when you

9        objected to this you said I can inquire into

10       the names of those --

11           MR. HAYES:  I said the opposite.  I

Page 45

52441a.txt

```
12        said if you wanted to ask about what, if any,

13        products were sold into Illinois, to try to

14        avoid any dispute, I would allow the witness

15        to answer that.  What I said -- I don't think

16        that that's proper jurisdictional discovery.

17              In order to try to be cooperative and

18        to move this process forward I would allow it,

19        but I don't -- at least I won't object to it,

20        but I just think that the names of our

21        distributors are confidential.

22              Even if you are right, the names don't

23        add anything to your argument because if it's

24        X versus Y in Illinois that's not going to
```

48

```
1         help you any.

2               MR. FUCHS:  That's true.  I understand

3         that.

4               MR. HAYES:  And there's a sensitivity

5         on the part of the client, even though we have

6         this agreement and I'm not saying you wouldn't

7         honor it, but nevertheless, when you're

8         dealing with competitors there's a sensitivity

9         of disclosing that information.

10              MR. FUCHS:  I understand that.

11    BY MR. FUCHS:

12        Q.    So there are silver-based nylon
```

Page 46

52441a.txt
13    products that Noble sells to customers in Illinois?

14         A.    Correct.

15         Q.    Can you describe the nature of these

16    products?

17         A.    It's one of the three forms that we

18    sell X-STATIC in.  Again, filament, staple fiber or

19    foam.

20         Q.    And what typically are these

21    silver-based nylon products, the filament, the staple

22    fiber and the foam products used to fabricate?

23         A.    It's a wide variety of finished

24    products that are looking for the benefits of silver.

49

1         Q.    And would they be made to say clothing,

2    used to make clothing?

3         A.    That is one of the applications.

4         Q.    What are some of the others?

5         A.    Wound care products, industrial

6    filtration, shoes.

7         Q.    And of the wound care products, can

8    you -- do you know specifically what -- for customers

9    in Illinois if they are making wound care products

10   from these X-STATIC products?

11        A.    The customers in Illinois are not

12   making wound care products.

13        Q.    Do you know what the customers are

Page 47

52441a.txt

14    making in Illinois?

15    A.    I do.

16    Q.    Can you tell me what that is?

17    A.    A primary customer is making thermal

18    products.

19    Q.    Would that be clothing products?

20    A.    No.

21    Q.    Like insulating product; is that

22    correct?

23    A.    Correct.

24    Q.    Any other products that you know of in

50

1    Illinois?

2    A.    No.

3    Q.    So the only products that you know of

4    that are being made from the X-STATIC fibers in

5    Illinois is the thermal product?

6    A.    That's correct.

7    MR. HAYES:  Wait.  That's not what he

8    testified to.  He said that the only raw

9    materials shipped to Illinois are being used

10    to make thermal products.  I don't think he

11    ever said that they were made -- that finished

12    product was made in Illinois.

13    THE WITNESS:  That's correct.

14    MR. FUCHS:  Fair enough.  Thank you.

Page 48

52441a.txt

15              I'm going to mark as Exhibit Number 8

16       what is entitled a Distributorship Agreement

17       and it has Bates Numbers N404 through N418.

18               * * * * *

19            (Whereupon, Exhibit-8 was marked for

20       identification.)

21               * * * * *

22  BY MR. FUCHS:

23       Q.     Have you had a chance to review that,

24  Mr. Keane?

51

1       A.     I have.

2       Q.     Okay.  Did you know that the

3  distributor -- this is a distributor agreement

4  between Noble Fiber and Derma Sciences.  Did you know

5  that these documents had been redacted?

6       A.     No.  I've never seen this document

7  before.

8       Q.     Did you notice on page 2 at the top of

9  the page it mentions -- it says redacted and then

10  under subparagraph H there is a portion of the

11  language that seems to obscured or redacted.

12            Do you know why that was redacted?

13       A.     I've never seen this document before.

14       Q.     Were you involved in the gathering of

15  documents for producing Noble documents in response

Page 49

52441a.txt

16    to Argentum's request for documents?

17         A.    I had knowledge of the gathering of

18    documents.  I personally did not gather them.

19         Q.    Can you tell me who did gather them

20    from Noble?

21         A.    That team previously mentioned.

22         Q.    Did you make any requests that these

23    documents be produced in redacted format?

24         A.    No, I did not.

52

1         Q.    So you know nothing of the redactions?

2         A.    I've never seen this document before.

3    I do not know why this was redacted because I have

4    never seen it before.

5         Q.    Okay.  Fair enough.

6         A.    I'd also note that it's non-executed by

7    Noble Fiber.

8         Q.    All right.  I'm almost finished here.

9    I just want to get a little bit into Noble's

10    products, where they're manufactured and I guess

11    let's start with the SilverSeal product.

12              Can you tell me the steps that are

13    required in manufacturing the product?

14              MR. HAYES:  The steps on how to

15         manufacture it?

16              MR. FUCHS:  Who is involved generally.

Page 50

52441a.txt
17              The entities involved in manufacturing,
18              packaging, sterilizing, that kind of thing,
19              where these entities are located.
20    BY MR. FUCHS:
21          Q.    So the first thing is can you just
22    generally describe for me the steps in making a
23    SilverSeal wound contact dressing?
24          A.    We, Noble, produce the X-STATIC

53

1    component, the silver nylon component that will be
2    placed into that end wound care product.  Once that
3    is produced, we take that and give it to third-party
4    contractors who produced that product only for us and
5    provide us back with a finished product.
6          Q.    So does Noble coat nylon with a silver?
7          A.    That's correct.
8          Q.    Is that done in Scranton, Pennsylvania?
9          A.    That's correct.
10         Q.    Where does the product get shipped
11   next?  Let me strike that.
12               What is the next step in the process
13   after the X-STATIC fiber is made?
14         A.    It goes through our quality control
15   process, making sure it's meeting all of our
16   requirements.  It is then sent to third-party
17   contractors for the various fabrication,

Page 51

52441a.txt

18    sterilization and packaging steps.

19        Q.      What is the next step?  Do you go to

20    a weaver or some sort of textile company that forms

21    it into a fabric?

22        A.      We actually metallize the fabric.

23        Q.      So the nylon fiber would be sent to a

24    fabricator who would make a fabric from it?

                                                54

1         A.      In this particular case we actually

2     metallize the fabric, the sheet of fabric.

3         Q.      I see.  That's all done in Scranton?

4         A.      That's correct.

5                 MR. HAYES:  Designate all of this as

6         confidential.  This testimony is confidential.

7                 THE WITNESS:  Yes, please.

8     BY MR. FUCHS:

9         Q.      After the fabric is metallized, what

10    happens to that product then?

11        A.      It is sent to the various third parties

12    for fabrication, sterilization and packaging.

13        Q.      Are any of these entities located in

14    Illinois?

15        A.      No.

16                MR. FUCHS:  I think that's all I have

17        for now.

18                MR. HAYES:  We'd like to read and sign.

                        Page 52

```
                        52441a.txt
19                    * * * * *
20            (This concludes the deposition of
21      Jeffrey Keane at 4:28 p.m.)
22                    * * * * *
23
24
```

⌷

                                                                    55



```
 1              C E R T I F I C A T I O N
 2
 3
 4            I hereby certify that the proceedings and
 5      evidence noted are contained fully and accurately in
 6      the stenographic notes taken by me upon the foregoing
 7      matter dated April 29, 2008, and that this is a
 8      correct transcript of the same.
 9
10
11
12
                   Renee Schumann
13                 Court Reporter-Commissioner of Deeds
14
15            (The foregoing certification of this
16      transcript does not apply to any reproduction of the
17      same by any means, unless under the direct control
18      and/or supervision of the certifying reporter.)
19
```

52441a.txt

20

21

22

23

24