# EXHIBIT C

```
 1              IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION
 3      _____
 4      ARGENTUM MEDICAL, LLC              :    NO. 07CV6769
                                           :
 5            Plaintiff                    :
                                           :
 6            -VS-                         :
                                           :
 7      NOBEL BIOMATERIALS and DERMA       :
        SCIENCES, INC.                     :
 8                                         :
              Defendants                   :
 9      _____
10
                          *   *   *   *   *
11
                     TUESDAY, APRIL 29, 2008
12
                          *   *   *   *   *
13
              C O N F I D E N T I A L
14
15          Oral deposition of JEFFREY KEANE, was taken
16      at the law offices of Cozen & O'Connor, 1900 Market
17      Street, Philadelphia, Pennsylvania, before Renee
18      Schumann, a Notary Public of the State of New Jersey
19      and Notary Public of the Commonwealth of
20      Pennsylvania, on the above date, commencing at 3:03 p.m.
21
22                  FRONTINOREPORTING, LLC
            FRONTINO/DEFILIPPIS COURT REPORTING AGENCY
23                  34 North Front Street
              Philadelphia, Pennsylvania 19106
24                     (215) 922-2133
```

EXHIBIT

C

```
 1    A P P E A R A N C E S:

 2

 3          LAW OFFICES OF ROCKEY, DEPKE & LYONS

 4          BY: JOSEPH A. FUCHS, ESQUIRE

                233 S. Wacker Drive - Suite 5450

 5              Sears Tower

                Chicago, Illinois 60606

 6              (312) 277-2006

                Representing the Plaintiff

 7

 8

 9          LAW OFFICES OF COZEN & O'CONNOR

10

11          BY: ROBERT HAYES, ESQUIRE

12              1900 Market Street

13              Philadelphia, Pennsylvania 19103

14              (215) 665-5548

15              Representing Nobel Biomaterials, Inc

16

17

18          LAW OFFICES OF AKERMAN, SENTERFITT

19

20          BY: JAMES PURCELL, ESQUIRE

21              50 N. Laura Street - Suite 2500

22              Jacksonville, Florida 32202

23              (904) 798-3730

24              In-House Counsel for Noble Biomaterials
```

1                          I N D E X

2

3    WITNESS                                          PAGE

4

     JEFFREY KEANE,

5

          (Witness Sworn.)

6

7

          DIRECT EXAMINATION BY MR. FUCHS        05

8

9

10                      E X H I B I T S

11

     NUMBER          DESCRIPTION              PAGE

12

13   Exhibit-1 Notification of Docket Entry   04

14   Exhibit-2 Verification                   13

15   Exhibit-3 Invoice                        17

16   Exhibit-4 Invoices/Purchase Orders       19

17   Exhibit-5 General Objections             27

18   Exhibit-6 Invoices/Purchase Orders       33

19   Exhibit-7 Medico-Mart, Inc.              37

20   Exhibit-8 Distributorship Agreement      50

21

     REQUESTS FOR PRODUCTION:

22

23        None

24

```
 1                    * * * * *
 2            (It is agreed by and between counsel
 3       that sealing, filing, and certification are
 4       hereby waived and all objections, except as to
 5       the form of the questions, are reserved until
 6       the time of trial.)
 7                    * * * * *
 8            JEFFREY KEANE, having been duly sworn
 9       according to law, was examined and testified
10       as follows:
11                    * * * * *
12            MR. FUCHS:  Let's mark this as Exhibit
13       Number 1.
14                    * * * * *
15            (Whereupon, Exhibit-1 was marked for
16       identification.)
17                    * * * * *
18            MR. FUCHS:  This is a Notification of a
19       Docket Entry and this is basically the reason
20       that we're here today, that the Plaintiffs
21       moved for an order for an expedited discovery
22       and the Judge granted the order and has said
23       that Plaintiff is granted leave to depose
24       Jeffrey B. Keane on or before May 2, 2008.
```

```
 1                    *  *  *  *  *
 2              DIRECT EXAMINATION
 3                    *  *  *  *  *
 4    BY MR. FUCHS:
 5         Q.    All right.  Mr. Keane, have you ever
 6    been deposed before?
 7         A.    Yes.
 8         Q.    And how many times would you say you've
 9    been deposed?
10         A.    Once.
11         Q.    So can you state your name and spell it
12    for the record?
13         A.    Jeffrey Keane, J-E-F-F-R-E-Y,
14    K-E-A-N-E.
15         Q.    Can you tell me your home address?
16         A.    224 Mansfield Avenue, Darien,
17    Connecticut, D-A-R-I-E-N, 06828.
18         Q.    Can you give me a brief synopsis of
19    your positions you've held from after college to your
20    present position?
21         A.    Graduate school, MBA, Emory University.
22    Marketing positions, General Mills.  Marketing in
23    general management positions, National Foods, Inc.
24    General management positions, Playtex Products, Inc.
```

1    General management positions, Minami, Inc.,

2    M-I-N-A-M-I. General management positions, Somerset,

3    and currently CEO of Noble Biomaterials, Inc.

4         Q.    Can you give me a brief, I guess,

5    history of Noble Biomaterials or can you describe the

6    corporate forum of Nobel Biomaterials?

7         A.    Can you help me with that question?

8    I'm not quite sure what you mean.

9         Q.    Sure.   I am just wondering if you have

10   any subsidiary companies or if it's a single, Noble

11   Biomaterials, is that the only corporate entity for

12   which you work?

13        A.    Noble Biomaterials, Inc. is the

14   formalized umbrella corporation.   Underneath that is

15   two corporate entities, Noble Fiber Technologies and

16   Sauquoit Industries.

17        Q.    And can you tell me the nature of

18   Noble's business?

19        A.    We are in the business of metallizing

20   nylon.

21        Q.    And in particular, can you elaborate a

22   little bit on Noble Fiber Technologies?

23        A.    Maybe you could help me with that

24   question.

1          Q.      Okay.  Well, what is the difference

2    between Noble Fiber Technologies and Sauquoit?

3                  I'm trying to get an idea of how the

4    product lines are differentiated between those two

5    companies?

6          A.      They're not.  The two companies were

7    merged from an operating standpoint and so though the

8    two companies exist legally from an operating vantage

9    point, there's no differentiation between the two

10   corporate entities.

11         Q.      Are they both Delaware corporations?

12         A.      That's correct.

13                 MR. HAYES:  I think they're LLCs

14         actually.

15                 MR. FUCHS:  Okay.

16                 MR. PURCELL:  Bob?

17                 MR. HAYES:  Yes.

18                 MR. PURCELL:  Those are -- the

19         underlying LLCs are Pennsylvania LLCs.

20                 MR. FUCHS:  Okay.  Thank you.

21   BY MR. FUCHS:

22         Q.      Can you tell me what silver nylon

23   products Noble Biomaterials sells?

24         A.      We sell a filament based product, a

FrontinoReporting, LLC

1    staple based product, a foam based product and

2    additionally we sell finished wound care products.

3         Q.    And I notice that there were some

4    products dealing with sport goods like clothing and

5    that kind of thing, where would that fall within

6    your -- those items you just mentioned?

7         A.    We don't sell those directly.  Those

8    are sold by licensees of ours who make use of that

9    filament, staple or foam product.

10        Q.    What products in the wound care

11   division of Noble Biomaterials do you sell?

12        A.    Maybe you can be more specific.

13        Q.    Well, you have silver nylon wound

14   management products, can you identify those by name?

15        A.    Today we sell to the wound care

16   marketplace in two fashions.  One is we are a

17   supplier of silver nylon products to licensees, and

18   then additionally we sell finished products under the

19   brand name of SilverSeal.

20        Q.    Of the supplier of the silver nylon

21   products, can you identify the distributors you use

22   for that particular product?

23             MR. HAYES:  What product are you

24        talking about?

FrontinoReporting, LLC

1          MR. FUCHS:  I'm talking about the

2    supplier where you sell silver nylon that's

3    not in a completed state.

4          MR. HAYES:  That's beyond the scope of

5    jurisdictional discovery.

6          MR. FUCHS:  I disagree with that.

7          MR. HAYES:  On what basis?

8          MR. FUCHS:  Well, the idea here is that

9    jurisdiction can be based on specific or a

10    general jurisdiction.  So if Noble is doing

11    business in a regular fashion with the State

12    of Illinois, that would establish jurisdiction

13    regardless of whether it is a finished nylon

14    product or whether it falls under the patent.

15          MR. HAYES:  I disagree that the sale of

16    products to a distributor -- there's no

17    reasonable basis to argue that would satisfy

18    general jurisdiction.  I think it's beyond the

19    scope of jurisdictional discovery consistent

20    with the Court's order.

21          I'll instruct the witness not to answer

22    the question.

23          MR. FUCHS:  What I think we should do

24    is as long as we are going to have this

1    objection, because I see this is going to

2    be -- I figured based upon your answering of

3    the document request and the Interrogatories

4    relating to personal jurisdiction or specific

5    jurisdiction and not to general I thought this

6    objection may come up.

7         So I think we should probably try to

8    get Judge Lindberg on the phone and have him

9    resolve it right now.  I have the number right

10   here.

11                   *  *  *  *  *

12        (Whereupon, we went off the record to

13   call Judge Lindberg.)

14                   *  *  *  *  *

15        MR. FUCHS:  We are going to resume.  We

16   attempted to call Judge Lindberg's chambers

17   and we reached Judge Lindberg's voicemail

18   message, outgoing message.

19        So we were unable to resolve the issue

20   of whether or not we can inquire into issues

21   of general jurisdiction, and Mr. Hayes has

22   stated that we're going to be limited to

23   inquiring on issues to specific jurisdiction.

24        MR. HAYES:  No, that's not my position.

1          MR. FUCHS:  Okay.

2          MR. HAYES:  You're certainly entitled

3     to inquire as to both general and specific

4     jurisdiction.  I think the case law is well

5     settled, however, the general jurisdiction you

6     must show continuous ongoing activity itself

7     within the State of Illinois such as offices

8     there, regular place of business, that type of

9     thing.  If you want to ask questions along

10    those lines, you are certainly entitled to do

11    so.

12          However, to the extent that you want to

13    pursue questions of specific jurisdiction,

14    that would relate to the products that are

15    alleged to infringe the patent, which I

16    understand you claim generally are wound care

17    products which consist of those dressings that

18    would be applied directly to the wound, and

19    you allege certain other products like the

20    underliner -- cast underliner and I believe

21    the burn gloves also infringe; so, we provided

22    information about that.

23          I don't know if the witness has this

24    information, but as a compromise to try to

1    move this along if you want to ask where

2    distributors of other such products are

3    located without their names, which is

4    confidential information, and we

5    certainly even though we have a

6    confidentiality stipulation I don't think even

7    pursuant to that stipulation that we should

8    have to produce -- provide information that's

9    to a competitor's attorney that's not relevant

10   to the jurisdiction.

11       But anyway, if you want to ask where

12   distributors are located and if the witness

13   can provide that information I will allow him

14   to answer that as a compromise to try to move

15   this thing along.

16       MR. FUCHS:  I'm going to disagree.  I

17   will try to move along, but I believe the case

18   law supports that if you put a product in the

19   stream of commerce and it makes its way into

20   Illinois, that is sufficient to establish

21   personal jurisdiction either general or

22   specific, but I'll move on.

23       I'm going to mark what is entitled

24   Verification of Jeffrey B. Keane in Support of

1    Defendant Noble Biomaterials, Inc.'s Motion to

2    Dismiss Or Transfer.

3                    * * * * *

4         (Whereupon, Exhibit-2 was marked for

5    identification.)

6                    * * * * *

7    BY MR. FUCHS:

8         Q.    Mr. Keane, I'm going to hand you what

9    is marked as Exhibit Number 2.  I just want to see if

10   you're familiar with this document.

11        A.    Yes, I'm familiar with this document.

12             MR. HAYES:  Off the record for another

13   second.

14                    * * * * *

15        (Whereupon a discussion was held off

16   the record.)

17                    * * * * *

18   BY MR. FUCHS:

19        Q.    Were you involved with the preparation

20   of this document?

21        A.    Yes.

22        Q.    And did you have any help from any

23   non-attorney in preparing this document?

24        A.    Yes.

1          Q.       Can you identify those people that were

2     involved?

3          A.       Specific names?

4          Q.       Yes, and positions, please.

5          A.       In addition to attorneys.

6          Q.       No, not including attorneys.

7          A.       Ron Flormann, who is general manager of

8     our wound care division.  Jeff Glattely, who is

9     director of marketing for our wound care division.

10    Jim Walsh, who is our chief financial officer.  Joel

11    Furey, who is our EVP of business development.  Gail

12    Prymock, who is our customer service representative.

13    To my knowledge, that's the list.

14         Q.       So it would be Ron Flormann --

15         A.       Excuse me, there would be one more.

16         Q.       Okay.

17         A.       Pat Davidson, who is our legal

18    assistant and not a lawyer.

19         Q.       Okay.  Thank you.

20                  So other than Ron Flormann, Jeff

21    Glattely, Jim Walsh, Joel Furey, Gail Prymock and Pat

22    Davies --

23         A.       Davidson.

24         Q.       Pat Davidson, thank you.  Can you think

1   of anybody else that may have been involved?

2          A.      At this point in time, no.

3          Q.      Do you have anything to help you

4   remember?  Do you have any notes or anything that

5   would help you to refresh your recollection?

6          A.      I do not have any notes to refresh my

7   recollection.  Having said that, there were aspects

8   of the data collection where there may have been --

9   these people may have asked others to cooperate in

10  that effort.

11         Q.      I understand.

12                 Did you contact any distributors of

13  Noble for the purpose of answering or for filling out

14  this verified statement?

15         A.      I did not directly contact anyone.  I

16  think within that group of people there was a

17  conversation with Derma Sciences to determine what

18  their initiatives, if any, were.

19         Q.      Do you know who had that conversation?

20         A.      No, I don't.

21         Q.      Can you tell me what Noble's practices

22  are in selling its wound care products?

23         A.      Can you be more specific?

24         Q.      Sure.  How are the orders taken?

1        A.        The majority of our orders are

2    received -- are placed by a distributor directly to

3    us.  We will process that order through our customer

4    service department.  If we have the inventory, ship

5    it.  If we don't have the inventory, order it and we

6    will then ship it to that distributor, typically FOB

7    Scranton and that's our order fulfillment process.

8        Q.        Do you take orders by telephone?

9        A.        Yes.

10        Q.        Do you take them by e-mail?

11        A.        Yes.

12        Q.        And fax?

13        A.        Yes.

14        Q.        And e-mail or electronically?

15        A.        Through e-mail, yes.  Not EDI, not

16    electrical data interface, no.

17        Q.        Do you take any orders from the

18    internet?

19        A.        No.

20        Q.        What documents are prepared in

21    processing these orders?

22        A.        We have within our order entry system

23    essentially a report that lists each of the entries

24    by a specific item number, and that is essentially

1    our manifest that drives our fulfillment process.

2        Q.    What specific documents though like --

3    do you have invoices, bill of ladings, purchase

4    orders, that kind of thing?

5            Can you take me through the process

6    from the time you receive an order to the time it's

7    shipped?

8        A.    I can't, no.

9        Q.    How come you can't?

10        A.    I don't know it.

11        Q.    You don't know the process?

12        A.    No.

13        Q.    Who would know that process?

14        A.    I would -- our order entry people would

15    know that.

16            MR. FUCHS:  I'm going to ask the court

17        reporter to mark Exhibit Number 3 documents

18        produced under Bates Numbers N000068 through

19        N0069.

20                    * * * * *

21            (Whereupon, Exhibit-3 was marked for

22        identification.)

23                    * * * * *

24    BY MR. FUCHS:

1          Q.       I'm going to show you what has been

2     marked as Exhibit Number 3, and it says at the

3     caption -- it says invoice and it has invoice number

4     258075 and it's addressed to Edgepark,

5     E-D-G-E-P-A-R-K, all one word, Surgical of 1810

6     Summit Commerce Park, Twinsburg, Ohio.

7                   Can you tell me what that document is?

8          A.       No, I cannot.

9          Q.       Have you ever seen this type of

10    document?

11         A.       No, I haven't.

12         Q.       Is it possible that this is a Noble

13    invoice?

14         A.       Possible.

15         Q.       One thing I noticed on this document is

16    that the invoice has -- it says bill to Edgepark

17    Surgical, and then on page N69 it's delivered to RGH

18    Horned Frog Medical in Fort Worth, Texas.

19                  Do you understand why that would be

20    done?

21         A.       No, I don't.

22                  MR. FUCHS:  I'm going to ask the

23            reporter to mark Exhibit Number 4, documents

24            Bates Numbered N000092 through N000102.

1                    * * * * *

2               (Whereupon, Exhibit-4 was marked for

3          identification.)

4                    * * * * *

5    BY MR. FUCHS:

6          Q.     Okay.  I'm going to show you what has

7    been marked as Exhibit Number 4; and, again, this has

8    a caption, invoice and it says bill to Edgepark

9    Surgical, that's on page 92.

10              Are those Noble documents?

11         A.     Possibly.

12         Q.     I'm looking at page N92.  You have

13   under item number it has the SS-WCD-0404.  Can you

14   tell me what that refers to?

15         A.     No, I cannot.

16         Q.     Do you know anybody who could tell us

17   what that refers to?

18         A.     Possibly.

19         Q.     Who would that be do you think?

20         A.     Customer service people.

21         Q.     All right.  Can I direct your attention

22   to N97 within Exhibit Number 4.  Have you ever seen

23   this document before?

24         A.     No.

1      Q.      Do you know who generated this

2   document?

3      A.      No.

4      Q.      Do you think this is a Noble document?

5      A.      I don't know.

6      Q.      Do you see under the caption silver

7   contact layer dressings?

8      A.      Yes.

9      Q.      There's a reference under the column

10  headed by HCPC the number A6207 and it has

11  manufacturer, Care Medical; item number WCD412 and

12  then Silverlon contact.

13              Do you understand why this would -- why

14  Silverlon would appear in this document?

15     A.      No.

16     Q.      Can you tell me who sells Noble's

17  products?

18     A.      Would you be more specific?

19     Q.      Sure.  Let's start with the wound care

20  products.

21     A.      Can you be more specific?

22     Q.      Well, let's talk about Noble direct

23  sales first.  Does Noble have a direct sales force?

24     A.      For which products?

1      Q.     For its wound care products.

2      A.     Again, which wound care products?

3      Q.     Sold under the SilverSeal name.

4      A.     Yes, we do.

5      Q.     How many people are involved with that

6  sales effort?

7      A.     Direct sales?

8      Q.     Yes.

9      A.     Two.

10     Q.     Can you tell me their names?

11     A.     Ron Flormann, Jeff Glattely.

12     Q.     Do you know how they go about making

13  sales of Noble's wound care products under the

14  SilverSeal name?

15     A.     Can you be more specific?

16     Q.     What is the nature of their sales

17  activities?

18     A.     I still don't understand the question.

19     Q.     How do they go about generating

20  business for Noble?

21     A.     They primarily spend their time

22  identifying distributors that will sell the

23  SilverSeal wound care products to users.

24  Additionally, there are some accounts where we

1    service directly not through a distributor.  That's a

2    minority of their time.

3         Q.    Do you know -- can you identify the

4    names of the companies where you sell directly to or

5    Noble sells directly to these people?

6         A.    I can identify one, but it won't be

7    exhaustive.

8         Q.    Who is that one?

9         A.    That would be Mercy Hospital.

10        Q.    Where are they located?

11        A.    In Pennsylvania.

12        Q.    Can you tell me the number of sales

13   offices you have for Noble?

14        A.    Can you be more specific in terms of

15   which products?

16        Q.    For any of its products.

17        A.    Do you want that -- can you give me a

18   definition of sales office?

19        Q.    It could be somewhere where people work

20   in order to generate orders, could be their homes,

21   could be official offices with Noble signage,

22   anything like that?

23             MR. HAYES:  Objection to the question

24             as vague and ambiguous.  Overbroad.  You can

1        answer it.

2              THE WITNESS:  I don't understand the

3        question.

4              MR. HAYES:  Are you asking what offices

5        Noble maintains?

6              MR. FUCHS:  Yes.

7              THE WITNESS:  We have an office in

8        Scranton, Pennsylvania.  We have an office,

9        official office, in Veneziano, Italy.  Then we

10       have people around the globe working out of

11       their homes.

12  BY MR. FUCHS:

13       Q.     For the people in the United States

14  working from their offices, how many people does that

15  include?

16       A.     A range of -- because I don't have the

17  exact number, between 10 and 15.

18       Q.     And do you know the location of these

19  offices or these home offices?

20             MR. HAYES:  Objection to the form of

21       the question.  Assumes facts not in evidence.

22       You can answer.

23             THE WITNESS:  No, I don't know them

24       all.

1    BY MR. FUCHS:

2          Q.      Do you know if any of them are in

3    Illinois?

4          A.      Yes, and there are none.

5          Q.      So you know they are not in Illinois,

6    but you don't know exactly where they are, correct?

7          A.      Correct.

8          Q.      How do you know that they're not in

9    Illinois?

10         A.      Because we checked.

11         Q.      How did you check?

12         A.      We went through our employee list.

13         Q.      Let's talk about authorized

14   distributors.  How does someone become an authorized

15   distributor of Noble products?

16         A.      Would you be more specific in terms of

17   products?

18         Q.      Any of Noble's products.

19               THE WITNESS:  In becoming a distributor

20          for SilverSeal we determine if it's a

21          qualified business partner, the kinds of end

22          customers that they access, the business

23          philosophy and the way that they do business,

24          whether they have appropriate credit terms.

FrontinoReporting, LLC

1    BY MR. FUCHS:

2           Q.      How do you -- what else has to occur?

3                   Do you have to have a signed agreement

4    for them to become authorized distributors?

5           A.      Typically yes, but not always.

6           Q.      What instances have you not had a

7    signed agreement?

8           A.      Historically there have been some

9    handshake agreements for distribution of some of the

10   wound care products.  At present, all distribution is

11   formalized with a written agreement.

12          Q.      Can you identify the companies with

13   which you have a handshake agreement with?

14          A.      To the best of my knowledge, we have

15   none currently, so we don't have any distributors

16   with handshake agreements on SilverSeal wound care

17   products.

18          Q.      So the list of people who distribute

19   the SilverSeal product will be different from the

20   list of people that distribute other of Noble's

21   products?

22          A.      Possibly.

23          Q.      Do you know where the authorized

24   distributors are located for the SilverSeal product?

1       A.     Exhaustively, no.

2       Q.     Do you know if any are in Illinois?

3       A.     Yes.

4       Q.     And are any in Illinois?

5       A.     No.

6       Q.     How do you know that?

7       A.     We checked.

8       Q.     Who checked?

9       A.     That same list of people that we

10  identified earlier.

11       Q.     Okay.  Do you know if any of your

12  distributors -- strike that.

13            Do any of your distributors of the

14  SilverSeal product have warehouses in Illinois?

15       A.     I wouldn't know that.

16       Q.     Do you know if any of your distributors

17  target sales in Illinois?

18       A.     I wouldn't know that.

19       Q.     Do you know who would know that?

20       A.     Yes.

21       Q.     Who would that be?

22       A.     The distributors.

23       Q.     Anybody within Noble that would know

24  that?

1          A.       Not necessarily.

2          Q.       So you don't know whether any of your

3   distributors target Illinois?

4          A.       That's correct.

5          MR. FUCHS:  I'm going to mark what is

6   captioned Answers and Objections of Defendant

7   Noble Biomaterials, Inc. to Plaintiff,

8   Argentum Medical, LLC's Jurisdictional

9   Interrogatories.

10                        *  *  *  *  *

11          (Whereupon, Exhibit-5 was marked for

12   identification.)

13                        *  *  *  *  *

14  BY MR. FUCHS:

15          Q.       I'm going to show you what I've marked

16  as Exhibit Number 5 and ask you if you have seen this

17  before?

18          A.       Yes, I recognize this document.

19          Q.       Okay.  Can you direct your attention

20  to -- it doesn't have numbers on it, but it's page 2

21  where it starts Interrogatory Number 1, it states:

22  State the name and address of each seller,

23  distributor and/or reseller of number one; Noble

24  products; and number two, SilverSeal products.

FrontinoReporting, LLC

1          And then in response to that on the

2   next page you said that the defendant responds that

3   the following entity serve as distributors of Noble's

4   wound dressings, burn gloves and/or undercast liner.

5   And then under that you have 15 distributors

6   identified on the next three pages.

7          Is this a complete list of Noble's

8   distributors?

9          A.     Yes, for SilverSeal products.

10         Q.     How do you know that?

11         A.     We checked our records of whom we sell

12   to.

13         Q.     Do you have a distributorship agreement

14   with each of these entities?

15         A.     I don't know that.

16         Q.     I'm going to direct your attention to

17   page 4 of this document and we have three entities in

18   the middle of the page, AliMed, Juzo, Inc. and

19   Medico-Mart.  There were no distributorship

20   agreements produced for these parties or these

21   entities, do you know why that is?

22         A.     No, I do not.

23         Q.     Do you know if any of these exist?

24         A.     No, I do not.

1    Q.    Presumably since they are authorized

2  distributors they would have an agreement, wouldn't

3  you say it's fair to say?

4    A.    Can you be more specific in the

5  question?

6    Q.    Earlier you testified that in order to

7  be an authorized distributor of SilverSeal products

8  you have to sign a distributorship agreement and that

9  you had no handshake deals.

10    MR. HAYES:  Objection.  It misstates

11    the witness's testimony.

12  BY MR. FUCHS:

13    Q.    Isn't that correct?

14    A.    What I said was that to the best of my

15  knowledge we didn't have any handshake deals on

16  SilverSeal wound care products.

17    Q.    Your deal with AliMed, do you have a

18  distributorship agreement with AliMed?

19    A.    I don't know.

20    Q.    Who would know?

21    A.    Our legal counsel.

22    Q.    Anybody else?

23    A.    Our legal counsel.

24    Q.    Nobody within Noble?

1        A.        Not necessarily, no.

2        Q.        What about Jeff Glattely, would he have

3    an idea of whether or not there is a distributorship

4    agreement between AliMed and Noble?

5        A.        Maybe.

6              MR. HAYES:  Objection to the question.

7        You're asking the witness to speculate.

8    BY MR. FUCHS:

9        Q.        You testified earlier that Jeff

10   Glattely one of his primary jobs was to try to sign

11   up qualified distributors of the Noble SilverSeal

12   products; isn't that correct?

13       A.        Yes.

14       Q.        Do you know if Jeff Glattely has had

15   any interaction with AliMed?

16       A.        No, I do not.

17       Q.        Would Jeff Glattely be the person who

18   would most likely know the answer to whether or not a

19   distributorship agreement existed between Noble and

20   AliMed?

21             MR. HAYES:  Objection.  Asked and

22       answered.  It misstates the witness's

23       testimony.

24             THE WITNESS:  Maybe.

FrontinoReporting, LLC

1    BY MR. FUCHS:

2            Q.      Why do you say maybe?

3            A.      Ron Flormann may be the person who

4    dealt with it or this may be a preexisting

5    relationship that we had either to Jeff Glattely or

6    Ron Flormann joining us.

7            Q.      Would your testimony be the same for

8    Juzo, Inc., who would be the person from Noble most

9    knowledgeable about whether there is a

10   distributorship agreement between Juzo and Noble

11   Biomaterials?

12           A.      Legal counsel.

13           Q.      And anyone from Noble?

14           A.      Same two people.

15           Q.      Ron Flormann and Jeff Glattely?

16           A.      Correct.

17           Q.      And would that also be the same for

18   Medico-Mart?

19           A.      That's correct.

20           Q.      Do you know if any of the authorized

21   distributors identified have any employees from

22   Illinois?

23           A.      No, I do not.

24           Q.      Do you know if they have any warehouses

1    in Illinois?

2          A.    No, I do not.

3          Q.    Do you know if any of these authorized

4    distributors have any sales offices in Illinois?

5          A.    No, I do not.

6          Q.    And do you know whether any of these

7    authorized distributors have any contacts at all in

8    Illinois?

9          A.    Can you be more specific?

10         Q.    Any business relationships where they

11   sell SilverSeal product into Illinois.

12         A.    We do not sell SilverSeal products into

13   Illinois.

14         Q.    Do you have a prohibition against

15   selling SilverSeal products into Illinois?

16         A.    No, we do not.

17         Q.    Does Noble offer the SilverSeal product

18   for sale over the internet?

19               MR. HAYES:  Objection to the question.

20         Vague and ambiguous.

21               MR. FUCHS:  You can answer.

22               THE WITNESS:  We sell an athletic sock

23         via the internet, but we do not sell any

24         SilverSeal products via the internet.

1    BY MR. FUCHS:

2         Q.    Do you know if any of your

3    distributors, authorized distributors, that are

4    identified here in response to Interrogatory Number 1

5    whether any of them sell the SilverSeal product over

6    the internet?

7         A.    No, I do not.

8              MR. FUCHS:  I'm going to ask the court

9         reporter to mark as Exhibit Number 6 a

10        document Bates Numbered N152 through N162,

11        omitting the leading zeros.

12                    *  *  *  *  *

13             (Whereupon, Exhibit-6 was marked for

14        identification.)

15                    *  *  *  *  *

16   BY MR. FUCHS:

17        Q.    Have you had a chance to look that

18   over, Mr. Keane?

19        A.    Yes.

20        Q.    I would like to direct your attention

21   to the document with Bates Number N157.

22        A.    (Witness complies.)

23        Q.    It's entitled purchase order, it also

24   has the company name Medico-Mart, Inc.

FrontinoReporting, LLC

1           Have you ever seen this document

2    before?

3           A.    I have not.

4           Q.    Do you see on the right-hand side under

5    where it says F.O.B., it's in the second block, it

6    says shipping point prepay and add?

7           A.    Yes.

8           Q.    Do you have any idea of what that

9    means?

10          A.    It's referencing how it's going to be

11   shipped and who is going to pay.

12          Q.    What does that mean, how is it going to

13   be shipped according to this?

14          A.    I don't know that.

15          Q.    Let's move on to N158.

16          A.    (Witness complies.)

17          Q.    It's entitled invoice and it's number

18   257881, and it refers to sales order number 185262.

19   Do you see that, Mr. Keane?

20          A.    Yes.

21          Q.    And also, if you can switch back to

22   page N157.  At the top in the first block on the

23   right-hand side it says P.O. number 87837.

24          A.    Yes.

1          Q.          So that number matches the number that

2     is on the invoice on N158, wouldn't you agree?

3          A.          They are the same numbers.

4          Q.          Is it fair to say that this invoice at

5     N158 is responsive to the purchase order at N157?

6          A.          Can you be more specific in your

7     question?

8          Q.          That it refers to that purchase order?

9          A.          Maybe.

10          Q.          Is it possible that this is a Noble

11     invoice that is documenting the purchase order placed

12     by Medico-Mart?

13          A.          It's possible.

14          Q.          And also moving on to N159, it's

15     another purchase order from Medico-Mart number 88927,

16     and then the following page, Bates Numbered N160 it's

17     an invoice that refers to purchase order 88927.

18                    Is it possible that this is a Noble

19     invoice on N160 that is referencing a purchase order

20     sent by Medico-Mart at N159?

21          A.          It's possible.

22          Q.          And the date requested of that is on

23     February 29, 2008 according to document N159?

24          A.          That's correct.

1          Q.      And then on the invoice at N160 the

2     shipping date is February 26, '08?

3          A.      That's correct.

4          Q.      Do you know anything about

5     Medico-Mart's business?

6          A.      I do not.

7          Q.      Have you ever met with anybody at

8     Medico-Mart?

9          A.      No.

10         Q.      Would you be surprised to know that

11    Medico-Mart targets Illinois for sales of the

12    SilverSeal product?

13         A.      Could you be more specific in the

14    question?

15              MR. HAYES:  Object to the question.

16    BY MR. FUCHS:

17         Q.      Would you be surprised that Medico-Mart

18    states that it's business is it offers a complete

19    line of medical/surgical, laboratory and

20    pharmaceutical products to physician offices and

21    clinics throughout Wisconsin, northern Illinois and

22    southeastern Minnesota?

23              MR. HAYES:  Object to the form of the

24              question.  Assumes facts not in evidence.

FrontinoReporting, LLC

1          MR. FUCHS:  Please mark this as Exhibit

2      Number 7.  This is a printout from a web page

3      at www.medicomart.com and it states that --

4      you can read it, please.

5          THE WITNESS:  (Witness complies.)

6      Okay.

7                    *  *  *  *  *

8          (Whereupon, Exhibit-7 was marked for

9      identification.)

10                    *  *  *  *  *

11  BY MR. FUCHS:

12      Q.    This is the same Medico-Mart that

13  distributes SilverSeal products, is it not?

14          MR. HAYES:  Object to the form of the

15      question.  Lack of foundation.

16          THE WITNESS:  I don't know.

17  BY MR. FUCHS:

18      Q.    Do you see down below under 2008

19  copyright it says Medico-Mart, Inc., 2323 Corporate

20  Drive, Waukesha, Wisconsin on Exhibit Number 7?

21      A.    I do.

22      Q.    And then going back to the

23  Interrogatory responses marked with Exhibit Number 5

24  on page 3 of Exhibit Number 5, fourth name down on

1    the list.

2              A.      Yes.

3              Q.      It appears that the Medico-Mart

4    referenced in Exhibit Number 7 is the same

5    Medico-Mart that is an authorized distributor for

6    Noble?

7              A.      The addresses are the same.

8              Q.      Sir, are you surprised to know that the

9    Medico-Mart that appears to be the same distributor

10   of SilverSeal products is targeting Illinois for

11   sales?

12                  MR. HAYES:  Objection.  Misstates the

13            terms of the document.  Lack of foundation.

14                  THE WITNESS:  The document also says

15            that they target using your term Wisconsin and

16            southeastern Minnesota.

17                  MR. FUCHS:  Correct.  That's correct.

18   BY MR. FUCHS:

19             Q.      So it does not come as a surprise to

20   you that one of your distributors is targeting

21   Illinois?

22                  MR. HAYES:  Objection to the form of

23            the question.  It misstates the terms of the

24            document.  The document in no way states

1          targets Illinois.

2     BY MR. FUCHS:

3          Q.    All right.   The document says that

4     Medico-Mart offers a complete line of

5     medical/surgical, laboratory and pharmaceutical

6     products to physician offices and clinics throughout

7     Wisconsin, northern Illinois and southeastern

8     Minnesota.   Are you at all surprised by that?

9          A.    No.

10         Q.    Would you be surprised to know that

11    SilverSeal product is -- strike that.

12              Would you be surprised if I told you

13    that Noble's SilverSeal's products are being sold in

14    Illinois?

15         A.    Yes.

16         Q.    Why would you be surprised?

17         A.    In our checking with our internal

18    records we have no record of ever having shipped any

19    product to Illinois, SilverSeal product to Illinois.

20              In checking through past invoices and

21    checking through sales history, we have no records of

22    selling SilverSeal into Illinois, ever shipping

23    SilverSeal product to Illinois in any of our dealings

24    with SilverSeal into the State of Illinois.

1        Q.        Do you receive any reports from your

2    distributors, your authorized distributors that you

3    identified in response to Interrogatory Number 1

4    whether they sell products into Illinois?

5        A.        Not to the best of my knowledge, no.

6        Q.        Is there any sales tracking information

7    such as that would identify the end users of these

8    products, you know, where the distributor sells to an

9    end user, do they identify to you that information?

10        A.        No, they don't.

11        Q.        So if they were selling it into

12    Illinois you really would not know?

13                If an authorized Noble distributor of

14    SilverSeal product were to sell product into Illinois

15    you would not know of that sale?

16        A.        That's possible.

17        Q.        You would only know of Noble's direct

18    sales to Illinois?

19                MR. HAYES:  Object to the form of the

20                question.  Misstates the witness's testimony.

21    BY MR. FUCHS:

22        Q.        What particular sales of the Noble

23    SilverSeal product would you know of -- let me

24    restate the question.

FrontinoReporting, LLC

1             What would be the nature of the sales

2    of Noble's SilverSeal products where you would know

3    the specific state that the products are shipped to?

4        A.      If we sold it directly or if we drop

5    shipped it for a distributor customer we would know

6    potentially the end customer address, and at that

7    point in time would be able to see precisely where

8    that product ended.

9             Additionally, we do have contact with

10   distributors to determine the geographic location of

11   sales, and in preparation for this meeting we did

12   check with distributors to determine whether sales

13   were made into Illinois.

14       Q.      And what distributors did you check

15   with?

16       A.      Primarily Derma Sciences.

17       Q.      Did you check with Medico-Mart?

18       A.      I don't know that.

19       Q.      Of any of the other distributors that

20   are identified in response to Interrogatory Number 1,

21   can you tell me which of those that you consulted

22   with?

23       A.      I personally have knowledge of Derma

24   Sciences specifically.  It is possible that someone

1    within our SilverSeal team had a broader contact with

2    distributor above and beyond Derma Sciences.

3         Q.    Could you identify any of the other

4    distributors on this list that you believe had been

5    contacted?

6         A.    I cannot directly, no.

7         Q.    Who would be the person who would have

8    contacted them?

9         A.    The various people that we had

10   mentioned previously on that list.

11        Q.    So Ron Flormann?

12        A.    Correct.

13        Q.    Jeff Glattely?

14        A.    Correct.

15        Q.    Jim Walsh?

16        A.    No.

17        Q.    Joel Furey?

18        A.    Yes.

19        Q.    Gail Prymock?

20        A.    Yes.

21        Q.    Pat Davidson?

22        A.    Correct.

23        Q.    But they didn't report back to you

24   or -- let me ask you this, did these people report

1   back to you on their discussion with the

2   distributors?

3        A.   There were non-specific, non-named

4   conversations about other distributors that produced

5   the point of view that SilverSeal products were not

6   sold in Illinois.

7        Q.   What documents did you check from Noble

8   to determine whether the products were sold into

9   Illinois, sold or shipped into Illinois?

10        A.   We checked our invoices, our internal

11   sales tracking system and our ship-to manifests.

12        Q.   Who checked the invoices on behalf of

13   Noble?

14        A.   People on that team.

15        Q.   Who are those people?

16        A.   The same ones we just went through.

17        Q.   Okay.  How about the internal sales

18   tracking software?

19        A.   Same group of people.

20        Q.   Now, what about the ship-to manifest?

21        A.   Same group of people.

22        Q.   What is the ship-to manifest?

23        Can you give me an idea of what this

24   manifest looks like?

1          A.      No, I've never seen it.

2          Q.      Do you know if it identifies the

3   product that is being shipped?

4          A.      Yes, it does.

5          Q.      It does.

6                  Do you know what else it identifies?

7          A.      I do not.

8          Q.      Presumably the addressee?

9          A.      That is correct.

10         Q.      Was there any limitation in your search

11  for -- of the shipped to manifest as far as dates?

12         A.      No, there was not.  We checked all

13  available data across available tracking regardless

14  of dates.

15         Q.      Did you restrict the search to

16  shipments of the SilverSeal product?

17         A.      Yes, that's correct.

18         Q.      So if there were another Noble product,

19  let's say socks or other Noble product, fibers that

20  shipped to Illinois, you would have not identified

21  that as a sale in Illinois?

22         A.      That's correct.

23         Q.      Do you know whether or not there were

24  any such sales in Illinois?

1      MR. HAYES:  Object to the form of the

2   question.  There is no testimony that Noble

3   sells socks.

4      MR. FUCHS:  I think Mr. Keane did

5   testify earlier about a sock.

6  BY MR. FUCHS:

7      Q.    Didn't you, Mr. Keane?

8      A.    I did.

9      MR. HAYES:  That Noble sells socks as a

10  finished product.

11     THE WITNESS:  Yes.

12 BY MR. FUCHS:

13     Q.    Do you know whether or not Noble has

14  ever shipped or sold its socks in Illinois?

15     A.    Given we've sold two pair, I'm betting

16  it's not Illinois.

17     Q.    Okay.  I thought you sold a bunch of

18  the pairs to the Army?

19     A.    We don't sell the socks.  The testimony

20  you were referencing was a question asked about the

21  internet and we currently have an internet operation

22  that does make available athletic socks.  To date we

23  sold two pair.

24     Q.    Did Noble's shipping manifest or

FrontinoReporting, LLC

1    ship-to manifest identify Illinois as an addressee

2    for any of its products?

3          A.     I don't know.  I would speculate it

4    would though because we have customers there.

5          Q.     And customers for what products?

6          A.     Noble products.

7          Q.     Can you be more specific, which Noble

8    products?

9          A.     Silver-based nylon products.

10          Q.     Could you tell me the name of those

11    customers?

12               MR. HAYES:  Object to the question.

13          It's beyond the scope of jurisdiction.

14               MR. FUCHS:  Here is where we get into

15          the disagreement again.  Are you going to

16          instruct the witness not to answer?

17               MR. HAYES:  Yes.  You already asked

18          questions about the distributors and I let it

19          go to that extent, so what would be the

20          significance of their names?

21               MR. FUCHS:  If they're selling

22          silver-based nylon products into Illinois, as

23          Mr. Keane has just testified, it may be of

24          sufficient quantities to justify having

1    general jurisdiction over Noble.

2         MR. HAYES:  I disagree that that would

3    be sufficient basis for general jurisdiction.

4    That still doesn't change the fact that what

5    does the name add to the mix?

6         In other words, why does it matter what

7    the names are?

8         MR. FUCHS:  I think initially when you

9    objected to this you said I can inquire into

10   the names of those --

11        MR. HAYES:  I said the opposite.  I

12   said if you wanted to ask about what, if any,

13   products were sold into Illinois, to try to

14   avoid any dispute, I would allow the witness

15   to answer that.  What I said -- I don't think

16   that that's proper jurisdictional discovery.

17        In order to try to be cooperative and

18   to move this process forward I would allow it,

19   but I don't -- at least I won't object to it,

20   but I just think that the names of our

21   distributors are confidential.

22        Even if you are right, the names don't

23   add anything to your argument because if it's

24   X versus Y in Illinois that's not going to

1       help you any.

2               MR. FUCHS:   That's true.   I understand

3       that.

4               MR. HAYES:   And there's a sensitivity

5       on the part of the client, even though we have

6       this agreement and I'm not saying you wouldn't

7       honor it, but nevertheless, when you're

8       dealing with competitors there's a sensitivity

9       of disclosing that information.

10              MR. FUCHS:   I understand that.

11  BY MR. FUCHS:

12      Q.      So there are silver-based nylon

13  products that Noble sells to customers in Illinois?

14      A.      Correct.

15      Q.      Can you describe the nature of these

16  products?

17      A.      It's one of the three forms that we

18  sell X-STATIC in.   Again, filament, staple fiber or

19  foam.

20      Q.      And what typically are these

21  silver-based nylon products, the filament, the staple

22  fiber and the foam products used to fabricate?

23      A.      It's a wide variety of finished

24  products that are looking for the benefits of silver.

1    Q.    And would they be made to say clothing,

2    used to make clothing?

3    A.    That is one of the applications.

4    Q.    What are some of the others?

5    A.    Wound care products, industrial

6    filtration, shoes.

7    Q.    And of the wound care products, can

8    you -- do you know specifically what -- for customers

9    in Illinois if they are making wound care products

10   from these X-STATIC products?

11   A.    The customers in Illinois are not

12   making wound care products.

13   Q.    Do you know what the customers are

14   making in Illinois?

15   A.    I do.

16   Q.    Can you tell me what that is?

17   A.    A primary customer is making thermal

18   products.

19   Q.    Would that be clothing products?

20   A.    No.

21   Q.    Like insulating product; is that

22   correct?

23   A.    Correct.

24   Q.    Any other products that you know of in

1    Illinois?

2         A.    No.

3         Q.    So the only products that you know of

4    that are being made from the X-STATIC fibers in

5    Illinois is the thermal product?

6         A.    That's correct.

7              MR. HAYES:  Wait.  That's not what he

8         testified to.  He said that the only raw

9         materials shipped to Illinois are being used

10        to make thermal products.  I don't think he

11        ever said that they were made -- that finished

12        product was made in Illinois.

13             THE WITNESS:  That's correct.

14             MR. FUCHS:  Fair enough.  Thank you.

15             I'm going to mark as Exhibit Number 8

16        what is entitled a Distributorship Agreement

17        and it has Bates Numbers N404 through N418.

18                  *  *  *  *  *

19             (Whereupon, Exhibit-8 was marked for

20        identification.)

21                  *  *  *  *  *

22   BY MR. FUCHS:

23        Q.    Have you had a chance to review that,

24   Mr. Keane?

1        A.        I have.

2        Q.        Okay.  Did you know that the

3    distributor -- this is a distributor agreement

4    between Noble Fiber and Derma Sciences.  Did you know

5    that these documents had been redacted?

6        A.        No.  I've never seen this document

7    before.

8        Q.        Did you notice on page 2 at the top of

9    the page it mentions -- it says redacted and then

10   under subparagraph H there is a portion of the

11   language that seems to obscured or redacted.

12                 Do you know why that was redacted?

13       A.        I've never seen this document before.

14       Q.        Were you involved in the gathering of

15   documents for producing Noble documents in response

16   to Argentum's request for documents?

17       A.        I had knowledge of the gathering of

18   documents.  I personally did not gather them.

19       Q.        Can you tell me who did gather them

20   from Noble?

21       A.        That team previously mentioned.

22       Q.        Did you make any requests that these

23   documents be produced in redacted format?

24       A.        No, I did not.

FrontinoReporting, LLC

1      Q.      So you know nothing of the redactions?

2      A.      I've never seen this document before.

3  I do not know why this was redacted because I have

4  never seen it before.

5      Q.      Okay.  Fair enough.

6      A.      I'd also note that it's non-executed by

7  Noble Fiber.

8      Q.      All right.  I'm almost finished here.

9  I just want to get a little bit into Noble's

10  products, where they're manufactured and I guess

11  let's start with the SilverSeal product.

12              Can you tell me the steps that are

13  required in manufacturing the product?

14              MR. HAYES:  The steps on how to

15       manufacture it?

16              MR. FUCHS:  Who is involved generally.

17       The entities involved in manufacturing,

18       packaging, sterilizing, that kind of thing,

19       where these entities are located.

20  BY MR. FUCHS:

21      Q.      So the first thing is can you just

22  generally describe for me the steps in making a

23  SilverSeal wound contact dressing?

24      A.      We, Noble, produce the X-STATIC

1    component, the silver nylon component that will be

2    placed into that end wound care product.  Once that

3    is produced, we take that and give it to third-party

4    contractors who produced that product only for us and

5    provide us back with a finished product.

6        Q.    So does Noble coat nylon with a silver?

7        A.    That's correct.

8        Q.    Is that done in Scranton, Pennsylvania?

9        A.    That's correct.

10        Q.    Where does the product get shipped

11    next?  Let me strike that.

12              What is the next step in the process

13    after the X-STATIC fiber is made?

14        A.    It goes through our quality control

15    process, making sure it's meeting all of our

16    requirements.  It is then sent to third-party

17    contractors for the various fabrication,

18    sterilization and packaging steps.

19        Q.    What is the next step?  Do you go to

20    a weaver or some sort of textile company that forms

21    it into a fabric?

22        A.    We actually metallize the fabric.

23        Q.    So the nylon fiber would be sent to a

24    fabricator who would make a fabric from it?

1       A.      In this particular case we actually

2  metallize the fabric, the sheet of fabric.

3       Q.      I see.  That's all done in Scranton?

4       A.      That's correct.

5               MR. HAYES:  Designate all of this as

6       confidential.  This testimony is confidential.

7               THE WITNESS:  Yes, please.

8  BY MR. FUCHS:

9       Q.      After the fabric is metallized, what

10 happens to that product then?

11      A.      It is sent to the various third parties

12 for fabrication, sterilization and packaging.

13      Q.      Are any of these entities located in

14 Illinois?

15      A.      No.

16              MR. FUCHS:  I think that's all I have

17      for now.

18              MR. HAYES:  We'd like to read and sign.

19              *  *  *  *  *

20              (This concludes the deposition of

21      Jeffrey Keane at 4:28 p.m.)

22              *  *  *  *  *

23

24

FrontinoReporting, LLC

1             C E R T I F I C A T I O N

2

3

4        I hereby certify that the proceedings and

5   evidence noted are contained fully and accurately in

6   the stenographic notes taken by me upon the foregoing

7   matter dated April 29, 2008, and that this is a

8   correct transcript of the same.

9

10

11

12

          Renee Schumann

13        Court Reporter-Commissioner of Deeds

14

15        (The foregoing certification of this

16   transcript does not apply to any reproduction of the

17   same by any means, unless under the direct control

18   and/or supervision of the certifying reporter.)

19

20

21

22

23

24

FrontinoReporting, LLC